23 A.3d 373

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. MARIE HESS, DEFENDANT–APPELLANT.

Argued January 5, 2011—Decided July 21, 2011.

*Michele A. Adubato,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Robert D. Bernardi,* Burlington County Prosecutor, argued the cause for respondent (*Mr. Bernardi,* attorney; *Timothy M. Ellis,* Assistant Prosecutor, on letter in lieu of brief).

*Carol M. Henderson,* Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Paula T. Dow,* Attorney General, attorney).

*Richard D. Pompelio,* Director, submitted a brief on behalf of amicus curiae New Jersey Crime Victims' Law Center (*Mr. Pompelio,* attorney; *Mr. Pompelio,* of counsel; *Mr. Pompelio* and *N. Anthony Palumbo,* on the brief).

Justice ALBIN delivered the opinion of the Court.

In a negotiated agreement with the State, defendant Marie Hess pled guilty to aggravated manslaughter for killing her husband James (Jimmy) Hess, a City of Burlington police officer. Under the terms of the agreement, defendant was required to acknowledge that she would receive a thirty-year prison sentence, subject to a parole disqualifier (twenty-five-and-one-half years); to concede that the aggravating factors outweighed the mitigating factors; and to agree that neither she nor her attorney would seek a lesser term of imprisonment. At defendant's sentencing, despite evidence in his possession suggesting that defendant suffered from Battered Women's Syndrome when she killed her husband, counsel offered no mitigating evidence in support of a lesser sentence. Nothing in the plea agreement specifically precluded him from presenting such evidence. Moreover, counsel did not object to the plea agreement's restrictions on his right to argue on his client's behalf at sentencing; to the State's introduction of a video of the victim's life set to popular and religious music; or to an invective-filled victim-impact statement given by a police officer who served with defendant's husband.

In this appeal from the denial of defendant's motion for post-conviction relief, we conclude that defendant was denied her constitutional right to the effective assistance of counsel at sentencing. Defense counsel deprived the court of mitigating evidence that was necessary for a meaningful sentencing hearing. That alone so undermined the adversarial process that counsel no longer was serving in the role of an advocate as envisioned in our criminal justice system. Moreover, the constraints embedded in the terms of the plea agreement—drafted by the State and accepted by defense counsel—denied the court of arguments that may have shed light on relevant sentencing factors and how they

should be weighed. The terms of that plea agreement were incompatible with our holding in *State v. Warren*, 115 *N.J.* 433, 558 *A.*2d 1312 (1989), and the decision in *State v. Briggs*, 349 *N.J.Super.* 496, 793 *A.*2d 882 (App.Div.2002), and impinged not only on the role of counsel at sentencing, but also on the role of our courts as independent arbiters of justice. Last, defense counsel was constitutionally ineffective for failing to challenge the unduly prejudicial video tribute to the victim scored to popular and religious music.

Defendant has sought only a new sentencing hearing. Because the plea agreement's restrictions on defense counsel's right to argue for a lesser sentence are in contravention of this State's decisional law, those terms are void. The State is free to proceed to a new sentencing hearing or to vacate the plea.

## I.

Defendant Marie Hess met her future husband Jimmy when she was seventeen years old. The two were married ten years later in 1992. In 1995, Jimmy became a police officer in the City of Burlington, where they came to live. On the morning of August 19, 1999, the thirty-four-year-old defendant shot Jimmy in the head as he lay sleeping in bed.

After shooting her husband, defendant wrapped the gun in a T-shirt and stored it in a kitchen cabinet, and then went about the ordinary course of her day. She went off to work as a toll collector at the Burlington–Bristol Bridge. After completing her shift at 11:30 a.m., she took her husband's uniforms to the cleaners. She next picked up a pizza and returned home with it. She then entered her bedroom, where she observed her husband's head covered in blood, and called the 9–1–1 dispatcher at 12:15 p.m. The police arrived at defendant's home shortly afterwards.

No one disputes the fact that defendant killed Jimmy. The only issue was, why. Were they "really America's couple," as later described by the prosecutor, or was she the psychologically, and sometimes physically, battered woman as she described in her

first full statement to the police and in her post-conviction-relief petition?

Defendant gave her first formally recorded statement to detectives of the Burlington County Prosecutor's Office at 10:35 p.m. on the day she killed her husband.[1]

### Defendant's August 19, 1999 Statement

Defendant admitted shooting her husband, accidentally, when it was her purpose only to scare him. She described a history of domestic violence, psychological belittlement, and victimization leading up to the killing. In the months before the shooting, Jimmy became increasingly violent, the constant refrain being that she could "do nothin' right." They were having problems related to the house that they were in the process of purchasing. She was blamed for the delay in getting a mortgage, for not keeping papers in order, and for not wanting to make the move. She was blamed for the problems with their telephone service. A month earlier, Jimmy had "put his service weapon to [her] head and told [her] if [she] didn't straighten up [she] could disappear down in the" Pine Barrens. On an earlier occasion, Jimmy had physically assaulted her, pulling her hair and punching her on the lip, warning her that "he would be willing to lose his job and go back to construction work if [she] called the cops."

On the evening before the shooting, after completing his shift, Jimmy visited a local bar and, shortly after midnight, returned home heavily intoxicated. He yelled at defendant because his dinner was not ready. He complained that he was not getting his phone messages. He then "took his gun off the table" and pointed it at defendant's head, and told her to "straighten out" or else.

Defendant stayed on the couch that night, unable to sleep, watching the clock, and fearful that Jimmy might come at her. At 7:00 a.m., defendant left the couch and readied herself for work.

---

[1] In reciting the evidence of record, we do not make credibility findings. We do not intend to disparage the victim or excuse defendant's conduct. We merely lay out the evidence available to defense counsel at the time of sentencing.

She heard Jimmy awake, yelling that the telephone was disconnected, and she responded that she would tend to it after work. She next went to the basement and retrieved a gun. She then went to the bedroom where Jimmy had fallen back asleep. Defendant wanted Jimmy to "roll over and see" the gun pointing at him like she had seen it pointed at her, she wanted to scare him, and she wanted him to be "scared enough to say he was sorry for everything, and that [they] would work everything out." But the gun "went off accidentally."

That day, August 19, defendant was arrested and charged with the murder of her husband. The next day, she was admitted to the Forensic Psychiatric Hospital in Trenton "because of suicidal ideations."

### Forensic Psychiatric Hospital

On her admission to the hospital, defendant reported that "her husband was physically abusive towards her and she was afraid of him." She also stated that "if she did not kill him he would have killed her." She maintained that "she accidentally shot" her husband and "wanted to kill herself" as well. In the four months before shooting her husband, defendant "had lost about 28 pounds of weight" and "had difficulty sleeping." After four days of observation, defendant was released from the hospital and transferred to the Burlington County Jail.

### Indictment

On March 23, 2000, the Burlington County grand jury returned an indictment charging defendant with purposely or knowingly causing the death of her husband in violation of *N.J.S.A.* 2C:11–3(a)(1) and (2).

### Defense Investigation

Defendant's attorney retained a private investigator, Richard Strohm, who, in March and April of 2000, conducted interviews of nine people—friends and co-workers of Marie and Jimmy Hess—who had first-hand information about their marital relationship.

Those interviews revealed that Jimmy had abused and threatened his wife and attempted to dominate and control her.

Herbert Wickward was Jimmy Hess's long-time good friend. They hunted and fished together, and their families socialized with each other. Wickward remembered that on a fishing trip when defendant forgot the bait, or on a hunting trip when she forgot the shells, Jimmy called her "a stupid bitch and just belittled her. And he didn't care who was around." On a trip to the Poconos, when defendant spilled some grease one morning while cooking, Jimmy "threw up his fist and pushed her back to the table" and verbally berated her for fifteen minutes. On such an occasion, when Jimmy was in a rage, with his face "beet" red, he would listen to no one.

Wickward witnessed Jimmy "raise his hands and get in [defendant's] face, and say, shut up you bitch I'll kill you." Several times, Wickward heard Jimmy "threaten to kill [defendant], and . . . threaten to kill himself." Wickward knew that Jimmy drank to excess almost every night, including the night before his death. Although he never observed Jimmy physically assault defendant, on one occasion he saw defendant "with black eyes and abrasions on her face," which defendant explained was caused when "she ran into a door."

Some of the couple's friends noted that defendant would wear sunglasses, even during evening hours, suggesting that she was hiding bruises. Some of Jimmy's friends spoke of his penchant to drink to excess, and more so towards the end of his life. Some noted that defendant lost considerable weight in the months before she killed her husband.

Friends of the couple described Jimmy as "controlling," as treating defendant like a "slave." According to Margaret Fanelle, a neighbor, if Jimmy "told [defendant] to jump she would say how [high]." Defendant carried a portable telephone, even when in the yard or out hanging clothes on a line, because Jimmy "check[ed] on her all the time." Fanelle believed that defendant was afraid of her husband; you could see it "by just looking at her and

talking to her." Another neighbor, Andrea Goodman, recalled that Jimmy insulted his wife and made her cry, telling her that "she shouldn't think, and he thinks more in one day than she thinks in a week."

Marylyn Reppert, a mutual friend of the couple, remembered that a month before Jimmy's death she took a whale-boat trip with the Hesses. Reppert noticed that the long beaded braid that defendant always wore in her hair was missing. When Reppert asked what had happened, defendant "looked at Jimmy and then she said I cut it off." Out of her husband's presence, defendant explained that "Jimmy yanked it out of her head." Defendant told Reppert that the night before the shooting Jimmy "came home drunk and was very mad. And he put a gun to her head and told her that he could shoot her and get rid of her body where nobody would ever find it."

The bartender at the Woodshed Bar frequented by Jimmy recalled that Jimmy "lost his temper many times" and even threatened one of her friends, saying "he was going to bury her in the Pines and nothing could happen to him because he was a cop."

Also provided in discovery to defendant's attorney was a statement from Lieutenant Timothy Richardson of the Burlington Police Department, who recounted a fishing trip in Canada a year before Jimmy's death. One evening Jimmy had been drinking "heavily" and became "very violent" and had to be subdued. Indeed, as a result of that episode, Lieutenant Richardson refused to go on the next annual fishing trip if Jimmy was to be part of the excursion.

### Defendant's February 26, 2001 Statement

More than a year and a half after giving her first taped statement, defendant gave a second one at the Burlington County Prosecutor's Office. Defendant's attorney accompanied her to the office, but inexplicably left her alone when the formal interrogation session began. Defense counsel gave permission to a Burlington County Prosecutor's detective and the executive assistant prosecutor to question defendant in his absence.

In this statement, defendant offered a different motivation for the shooting and, with prompting from her interlocutors, downplayed the level of abuse in her relationship with Jimmy. At the outset of the interview, defendant described a Valentine's Day incident when Jimmy became enraged at her at a bar, ripping out the braids from her hair and smashing her "head a couple [of] times against the passenger side window of [a] truck." The interviewer then asked her whether this was "a one-time event," to which she responded, "Yes." Then, through a series of leading questions, the interviewer got defendant to recant her prior description of Jimmy as a violent person:

> Detective: In prior statements you have painted a picture of JIMMY as being a violent person. Okay, that's not an accurate description of JIMMY, is it?
>
> Defendant: No. He would get loud and sometimes make occasional threats but generally he would walk away.
>
> Detective: Okay. As a matter of fact, he has on numerous occasions by your own statements, walked out of the house or walked away from you rather than to either continue an argument or become physical in any way. Is that correct?
>
> Defendant: Yeah, that's correct.

Through more leading questions, defendant described how the family finances—for which Jimmy held her responsible—had snowballed out of control. Although Jimmy had expected to purchase his dream home in Chatsworth, defendant was not enamored with the idea. Defendant believed that the couple would not qualify for a mortgage for a new home because they were not making timely payments on their existing mortgage. She also believed that she would be blamed for the failure to obtain a mortgage. She did not submit an application for a mortgage because she knew it would be rejected. Instead, she engaged in an elaborate cover-up. She generated a fake mortgage-approval letter so Jimmy would think that they had been approved for the mortgage. She knew that her scheme to keep Jimmy in the dark about the seriousness of their financial problems was about to end.

When Jimmy came home for dinner at 12:30 a.m. on August 19, the two argued about their malfunctioning telephone and the impending move to a new home. He made it clear that he would

purchase the house with or without her, and also told her that he suspected that she was attempting to undermine the securing of a mortgage. Defendant admitted that she was emotionally hurt and angry that the new house meant more to Jimmy than his relationship with her, and that he would seek help from his family rather than rely on her.

That evening she lay on the couch thinking that Jimmy would soon learn about her mortgage-application ruse. She did not "want him to find out that [she] had messed up." She was angry with herself because she could not control the finances and angry about their fights in which he called her "stupid." She did not come clean with Jimmy about the state of their finances because "it would bring on an argument and name callin[g]" about how she could not "handle things right." There on the couch she decided to kill Jimmy.

In the morning, she retrieved and loaded a gun, wrapped it in a T-shirt to avoid leaving fingerprints, entered Jimmy's bedroom, cocked the hammer of the gun, aimed the gun towards his head correcting for her double vision, and fired once. She then went to work as though it were a normal day. Even when she called 9–1–1 that afternoon, she somehow hoped that she would not be caught.

### Plea Agreement

The State and defendant entered into a plea agreement, the terms of which were set forth in an April 5, 2001 letter from the executive assistant prosecutor to defense counsel. The letter makes clear that the agreement was prompted by defendant's "cooperation"—her statement given two weeks earlier. The "cooperation" sought was for defendant to "convey the truth as to the circumstances which led to her taking the life of her husband, and provide a truthful factual recitation of the manner in which she carried out the homicide."

Under the terms of the agreement, defendant would plead guilty to aggravated manslaughter; acknowledge that she would receive a thirty-year state-prison sentence with a twenty-five-and-

one-half-year parole disqualifier; concede "that the aggravating factors under *N.J.S.A.* 2C:44–1a so preponderate over the mitigating factors set forth in *N.J.S.A.* 2C:44–1b as to make the maximum term of 30 years appropriate"; agree that neither she nor her attorney would "affirmatively seek a lesser term of imprisonment from the Court"; and "agree not to appeal her judgment of conviction."

In return, the State agreed that it would dismiss the murder charge, thus "reducing by 4 1/2 years the mandatory minimum for murder, i.e. thirty years without parole, as the benefit [defendant] derives for her cooperation." The prosecutor disclaimed any intention to bind the court to the negotiated sentence, noting that the "principles enunciated in *State v. Warren*, 115 *N.J.* 433, 558 *A.*2d 1312 (1989)," would not allow such a restriction on the court's sentencing discretion. However, the prosecutor "believe[d] it permissible to bind [defendant] to this agreement."

On April 16, 2001, the plea agreement was placed on the record in open court. During the plea colloquy, defendant admitted to intentionally shooting and killing her husband, explaining through a series of leading questions that she had been hiding the family's financial difficulties from her husband and that the shooting was the culmination of "tensions" that had been rising at home.

*Sentencing*

At sentencing on June 22, 2001, without objection from defense counsel, Burlington Township Police Detective Michael Simmons gave a "victim-impact" statement in which he declared that defendant carried out an "execution," "an act of pure uncontrollable hate," a "cold blooded murder" and "cowardly act," and that Jimmy was also part of a larger fraternal family, a police "brotherhood." Jimmy's sister then addressed the court.

Next, without a defense objection, the prosecutor played a professionally produced seventeen-minute video. The video consists of a montage of approximately sixty still photographs of Jimmy's life from childhood to adulthood, including a photograph of his tombstone. It also consists of four separate home-video

clips of Jimmy: his graduation from the police academy, coaching a baseball game, and appearing on fishing trips. The video includes a television segment that covered Jimmy's funeral. Three poems are displayed over some of the photographs and video clips. The entire video is accompanied by a medley of music: a song by the Beatles, "Here Comes the Sun"; a holiday song, "I'll be Home for Christmas"; two country songs, "I'm from the Country" and "Live, Laugh, Love"; one religious hymn, "Here I Am Lord"; and military-like cadences.

The prosecutor in remarks covering twelve transcript pages described how the State viewed the killing "as a murder case." He stated that "to all who knew [defendant and Jimmy] they were really America's couple." He detailed what he believed were the financial motives behind the killing and the deliberate and calculated manner in which defendant shot her husband. He emphasized the aggravating sentencing factors and suggested that defendant's character "virtually wipes out any of the mitigating factors."

In response to that tour-de-force presentation, defense counsel stated that his hands were "somewhat tied" by the plea agreement. Defense counsel never mentioned any of the evidence that he developed from his client or from other witnesses that defendant was a physically and psychologically battered woman, who had been threatened and had feared for her life. He mentioned nothing redeeming about her character or her otherwise blameless life. His remarks comprised little more than one transcript page. He did not argue against an aggravating factor or in favor of a mitigating factor. He conceded that he could not, "pursuant to the plea agreement, ask the court to sentence [defendant] to less than" thirty years. Nevertheless, he asked the court to "make an independent evaluation of the defendant" and of "the aggravating and mitigating factors," and to consider whether a thirty-year sentence was appropriate for a thirty-four-year-old woman.

The court found support for aggravating factor number two, "the gravity and seriousness of harm inflicted on the victim," *N.J.S.A.* 2C:44–1(a)(2), because "Mr. Hess was asleep and ... just

didn't know what was coming," and for aggravating factor number nine, the need to deter, *N.J.S.A.* 2C:44–1(a)(9). The court also found support for mitigating factor number seven, because defendant had no prior criminal record, *N.J.S.A.* 2C:44–1(b)(7), and mitigating factor number twelve, because of defendant's willingness to cooperate with law enforcement authorities, *N.J.S.A.* 2C:44–1(b)(12). The court noted defense counsel's agreement that the aggravating factors outweighed the mitigating factors, and expressed its determination that they were "at least in balance if not for the fact that the aggravating factors really do outweigh the mitigating factors." The court referenced defense counsel's agreement not to argue for a sentence of less than thirty years.

The court ultimately concluded that "while [it was] authorized to sentence less than the plea agreement, this is the kind of a case where [defendant] certainly could have been sentenced to more had she gone to trial on the charge as originally brought and been found guilty." On the judgment of conviction, the court wrote: "This was a negotiated plea agreement between the Prosecutor and the defendant. It appears fair and in the interests of justice, the Court is imposing the recommended sentence." The court sentenced defendant to a thirty-year state-prison sentence subject to a twenty-five-and-one-half-year parole disqualifier pursuant to the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2. Finally, the court advised defendant of her right to appeal, but added that, if she did, the State could move to withdraw the plea offer under the terms of the plea agreement and move to reinstate the original murder charge.

## II.

### *Post Conviction Relief Application*

Defendant did not pursue a direct appeal. In September 2005, defendant filed a pro se petition for post-conviction relief (PCR) and an amended petition was later filed by counsel. Defendant essentially claimed that she was denied her constitutional right to the effective assistance of counsel at sentencing. At the PCR

hearing, PCR counsel argued that the sentencing represented "a total breakdown of the adversarial proceedings" inasmuch as "[t]rial counsel failed to act as an advocate" as a result of a plea agreement that was against public policy and unconstitutional. Trial counsel failed to argue mitigating factors, or to bring to the attention of the sentencing court the statements suggesting defendant was a battered woman, even though nothing in the plea agreement precluded him from doing so. Trial counsel failed to object to Detective Simmons's speaking as a victim-impact witness or to the introduction of the video. PCR counsel contended that the "[p]rosecutor went to great lengths to resolve this case in a way that protected the victim's image at the expense of the defendant and . . . justice."

PCR counsel attached to the petition the witness statements obtained by the defense investigator in 2000 that supported defendant's claim that she had been beaten, threatened, and continuously verbally belittled by her husband. PCR counsel also introduced the sixteen-page report of Dr. Dawn Hughes, a clinical psychologist who evaluated defendant on September 15, 2006 and who reviewed the case file, including defense investigative reports. Defendant reported to Dr. Hughes that, since 2001, she had been receiving individual and group counseling in prison from a domestic-violence agency. Defendant described an abusive relationship with her husband dating back to the late 1980s.

Jimmy would throw objects at her when angry and monitor her behavior. Jimmy first hit her across the head with the back of his hand after she forgot to pick up his uniforms from the cleaners. He apologized, but she did not make that mistake again. Six months before the shooting, defendant attempted to leave her husband. Jimmy caught her in the act as he was driving by in his police cruiser. Jimmy jumped out of his vehicle, pushed her into the house and beat her on the legs with his nightstick. She described incidents of physical abuse—his pulling hair out of her head, hitting her in the face causing black eyes, and slamming her head against a window—and psychological abuse, such as threats

to kill her. Her description of the August 19, 1999 shooting was similar to the one she first gave to the police: she intended to scare Jimmy, and the gun went off accidentally.

Dr. Hughes concluded that "the evidence revealed that [defendant's] report of domestic violence in her relationship with her husband, James Hess, is consistent with a pattern of moderate-to-severe intimate partner abuse, including physical and psychological abuse" and consistent with what is commonly referred to as Battered Women's Syndrome.

The State submitted a certification from defendant's trial attorney in which he averred that he discussed with defendant the terms and conditions of the plea agreement and the potential aggravating and mitigating circumstances based on the available evidence, and that he considered the offer "fair." Nowhere in the certification does defendant's trial counsel explain why he did not present at sentencing the mitigating evidence compiled during his investigation that corroborated a portrait of defendant as a battered woman or why he did not object to Detective Simmons's "victim-impact" statement or to the introduction of the video.

Based on her trial attorney's alleged professional deficiencies at sentencing, defendant requested a new sentencing hearing.

The PCR court denied defendant an evidentiary hearing and rejected her application for relief. The court noted that "there was little, if any, argument with regard to mitigating factors" at sentencing. Nevertheless, the PCR court believed the finding of any mitigating factors by the sentencing court was discretionary, not obligatory, and that an objection to the sentence—the failure to find mitigating factors—should have been raised on direct appeal. With regard to the introduction of Detective Simmons's statement, the court acknowledged that it was "a far stretch" to consider "Simmons as a family member and as a victim." The court also expressed some concerns about the video, in particular "the television tape of the funeral and the end which was the picture of the headstone." But the court observed that defense counsel raised no objection to either Simmons's statement or the

video. The PCR court concluded that defendant's claims challenging the excessiveness of her sentence were procedurally barred because they could have been raised on direct appeal, *see R.* 3:22–4, and that defendant had not established that "her sixth amendment rights, or any other rights, were violated by her willingness to enter into this [plea] agreement."

### III.

### A.

#### Appellate Division

In an unpublished opinion, the Appellate Division affirmed. The panel primarily relied on the procedural bar of *Rule* 3:22–4 that prohibits a defendant from raising issues in PCR proceedings that could have been raised in a prior proceeding. The panel *mistakenly* believed that defendant, at the PCR hearing, did not present "expert testimony that she suffered from post-traumatic stress disorder related to spousal abuse by" her husband or "specify exactly what mitigating evidence [trial counsel] should have presented at sentencing." As noted earlier, that information is part of the PCR record.

The panel considered defendant's challenge as nothing more than an excessive-sentence claim improperly raised for the first time in a post-conviction-relief proceeding. The panel perceived defendant as merely relitigating "her sentence in terms of the alleged improper consideration of the aggravating and mitigating factors." The panel found that defendant received the sentence she voluntarily and knowingly bargained for in her plea agreement. The panel determined that reliance on *State v. Briggs,* 349 *N.J.Super.* 496, 793 *A.2d* 882 (App.Div.2002), was misplaced. In *Briggs,* the Appellate Division reversed the sentence because of a restriction in a plea agreement that precluded defense counsel from arguing for a sentence less than the one stipulated to in the agreement. (Citing *Briggs, supra,* 349 *N.J.Super.* at 498, 793 *A.2d* 882). In *Briggs,* the challenge to the sentence was raised on

direct appeal, a critical distinction to the panel in this case. (Citing *id.* at 499, 793 *A.*2d 882). In addition, according to the panel, unlike *Briggs,* the record "clearly indicated the crime was a purposeful murder."

The panel discerned no basis to "second-guess" the sentencing court's discretionary decision to admit the victim-impact evidence, the video tape and Detective Simmons's in-court statement. It also was not persuaded that defendant's counsel was constitutionally ineffective and, even if he were, that defendant suffered any prejudice as a result. (Citing *Strickland v. Washington,* 466 *U.S.* 668, 687, 694, 104 *S.Ct.* 2052, 2064, 2068, 80 *L.Ed.*2d 674, 693, 698 (1984); *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987)).

## B.

### *Certification*

We granted defendant's petition for certification, *State v. Hess,* 203 *N.J.* 95, 999 *A.*2d 464 (2010), in which she claimed (1) that she was generally denied the effective assistance of counsel at sentencing, (2) that "the restrictive plea agreement deprived her of her right to counsel at sentencing," (3) that "[t]he admission of the victim impact statement of Detective Simmons and the videotape of the deceased was grossly prejudicial," and (4) that she was improperly denied an evidentiary hearing.[2] We also granted the motions of the New Jersey Crime Victims' Law Center and the Attorney General to participate as amici curiae.

## IV.

Defendant asserts that she was denied her constitutional right to the effective assistance of counsel at sentencing because her

---

[2] We did not grant certification on defendant's claim that the attorney/client privilege was breached as a result of the admission of defense counsel's certification at the PCR hearing or on her claim that her husband's police-department personnel file should have been provided as part of discovery in the PCR proceeding. *See Hess, supra,* 203 *N.J.* at 95, 999 *A.*2d 464.

attorney failed to bring to the court's attention information at his disposal that would have shown that she was a physically and psychologically battered woman, with a frayed mental state, when she killed her husband. That is, her attorney—despite evidence in his file—made no attempt to rebut the State's portrayal of her as a ruthless, cold-blooded, plotting assassin who murdered her police-officer husband from fear that he would learn of their poor finances and credit, their inability to obtain a bank loan for a new home, and her desire not to make the move. Although no provision of the plea agreement explicitly forbade her attorney from presenting mitigating evidence at sentencing or from objecting to prejudicial victim-impact evidence, he may have wrongly perceived that the agreement barred him from doing so. Defendant separately maintains that the restrictive plea agreement—the same type of agreement condemned in *Briggs*—deprived her of the assistance of counsel.

In response, the State argues that defendant's PCR ineffective-assistance claim is merely recasting an excessive-sentence challenge that should have been raised on direct appeal and therefore is procedurally barred by *Rule* 3:22–4. Moreover, the State contends that *State v. Briggs* is distinguishable from the present case, and, in any event, should not apply retroactively because it established a "new" rule of law.

We first look to our post-conviction-relief jurisprudence to see whether defendant was procedurally barred from raising the challenge that she was deprived of the effective assistance of counsel at sentencing.

A.

"Post-conviction relief is a defendant's last opportunity to raise a constitutional challenge to the fairness and reliability of a" state criminal proceeding. *See State v. Feaster,* 184 *N.J.* 235, 249, 877 *A.*2d 229 (2005) (citation omitted). A PCR hearing "is not a *pro forma* exercise, but a meaningful procedure to" root out

mistakes that cause an unjust result either in a verdict or sentence. *See ibid.*

A PCR petition is not a substitute for raising a claim on direct appeal, *see State v. Echols,* 199 *N.J.* 344, 357, 972 *A.*2d 1091 (2009), and generally an alleged excessive sentence—that is, a sentence within the range permitted by a verdict or a plea—is not cognizable on PCR, *see State v. Clark,* 65 *N.J.* 426, 436–37, 323 *A.*2d 470 (1974). Although ordinarily the failure to raise an issue on direct appeal will bar relief on PCR, there are exceptions to that rule. For example, a defendant may assert a PCR claim when "the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding," *R.* 3:22–4(a)(1), and when "enforcement of the bar to preclude claims, including one for ineffective assistance of counsel, would result in fundamental injustice," *R.* 3:22–4(a)(2). "Ineffective-assistance-of-counsel claims are particularly suited for post-conviction review because they often cannot reasonably be raised in a prior proceeding." *State v. Preciose,* 129 *N.J.* 451, 460, 609 *A.*2d 1280 (1992) (citation omitted). Indeed, we routinely decline to entertain ineffective-assistance-of-counsel claims on direct appeal because those claims "involve allegations and evidence that lie outside the trial record." *Ibid.* (citing *State v. Dixon,* 125 *N.J.* 223, 262, 593 *A.*2d 266 (1991); *State v. Walker,* 80 *N.J.* 187, 194, 403 *A.*2d 1 (1979) (other citations omitted)).

PCR is a proper vehicle for defendant's ineffective-assistance-of-counsel claim because much of the mitigating evidence that supports her argument that she was a battered woman was not presented to the sentencing court by her counsel. Therefore, an ineffective-assistance-of-counsel claim was not evident from the record and could not have been raised on direct appeal. We next turn to the standards governing ineffective assistance of counsel.

### B.

The Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution both

guarantee the accused the right to the "effective" assistance of counsel in a criminal proceeding.[3] *Strickland, supra,* 466 *U.S.* at 685–86, 104 *S.Ct.* at 2063, 80 *L.Ed.*2d at 692; *Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336. The proper functioning of the adversarial process depends on effective assistance of counsel; without such assistance other fundamental rights, including the right to a fair proceeding, likely will be rendered meaningless. *See Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694; *see also Powell v. Alabama,* 287 *U.S.* 45, 69, 53 *S.Ct.* 55, 64, 77 *L.Ed.* 158, 170 (1932) ("[A defendant] lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step of the proceedings against him.").

■ An ineffective-assistance-of-counsel claim is generally judged by the Sixth Amendment standards enunciated in *Strickland, supra*—standards also adopted by this Court in construing Article I, Paragraph 10 of the New Jersey Constitution. *Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336; *see also State v. Allah,* 170 *N.J.* 269, 282–84, 787 *A.*2d 887 (2002). To establish such a claim, a defendant must satisfy a two-pronged test. First, he must show that counsel's performance "fell below an objective standard of reasonableness," such that he "was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland, supra,* 466 *U.S.* at 687–88, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. Second, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698; *accord State v. Loftin,* 191 *N.J.* 172, 197–98, 922 *A.*2d 1210 (2007).

---

[3] The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." *U.S. Const.* amend. VI. In almost identical language, our State Constitution provides the same. *See N.J. Const.* art. I, ¶ 10.

To meet prong one, a defendant must overcome a "strong presumption" that counsel exercised "reasonable professional judgment" and "sound trial strategy" in fulfilling his responsibilities. *Strickland, supra,* 466 *U.S.* at 689–90, 104 *S.Ct.* at 2065–66, 80 *L.Ed.*2d at 694–95 (quotation and citations omitted). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. Nevertheless, if a defendant demonstrates that counsel's performance fell "outside the wide range of professionally competent assistance," then he has established that his counsel was constitutionally deficient. *Id.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695.

Even by this highly deferential standard, which requires us to avoid viewing counsel's performance through the "distorting effects of hindsight," *id.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694, the record is clear that defendant's attorney at sentencing was not functioning as the "counsel" required under both our Federal and State Constitutions.

## C.

The restrictive plea agreement entered into between defendant and the State required defendant to concede that the aggravating sentencing factors outweighed the mitigating factors and prohibited defendant from "affirmatively" seeking a term of less than thirty years subject to NERA. On the other hand, the plea agreement did not bind the court to give any particular sentence, and the prosecutor disclaimed any intention to impinge on the court's exercise of its discretion. Nothing in the plea agreement denied defense counsel the opportunity to provide the court with the mitigation evidence known to him through his investigator's work. The plea agreement did not preclude counsel from arguing that his client was a physically and psychologically battered woman to explain her motivations. At sentencing, de-

fense counsel urged the court "to make an independent evaluation of the defendant" and of "the aggravating and mitigating factors" in setting his client's sentence, yet withheld from the court the very information it needed to do so.

Defense counsel had nine witness statements corroborating his client's account of physical and mental abuse at the hands of her husband as well as his threats against her life. The statements available to defense counsel painted a picture of Jimmy Hess as a "controlling" husband who treated his wife like a "slave" and as a man with a hair-trigger, explosive temper. The statements buttressed defendant's account about the incident in which her husband ripped hair out of her head and about her blackened eyes from her husband's abuse. Defense counsel knew about his client's claim—in her first statement to investigators at the prosecutor's office—that her husband had put a gun to her head the night before she shot him. Defense counsel knew or should have known that immediately after his client's arrest she spent four days under observation at the Forensic Psychiatric Hospital, where she maintained that "if she did not kill [her husband] he would have killed her." Counsel did not relate that information to the court, nor did he inform the court that his client had lost twenty-eight pounds before the shooting—information confirmed by independent sources and a sure sign of the emotional distress suffered by defendant in the months leading to the shooting.[4]

Those statements, along with defendant's accounts, described "a pattern of moderate-to-severe intimate partner abuse" known as Battered Women's Syndrome, according to Dr. Dawn Hughes,

---

[4] Defense counsel left his client alone with investigators and the executive assistance prosecutor when she gave her second statement to the prosecutor's office—a statement that PCR counsel claimed was intended to protect the image of the victim-police officer. But even that statement, which downplayed the level of abuse earlier described by defendant, recounted how her husband had smashed her head against a car window and ripped the braids from her head. That statement also made clear that defendant feared her husband's wrath once he learned about the poor state of the family's finances and her feigning the mortgage-application process for a new home.

whose expert report was submitted at the PCR hearing. Defense counsel provided no such report to the sentencing judge, nor did he offer the seemingly obvious argument, based on the information available to him, that his client was a battered woman.

Battered Women's Syndrome is recognized as "a collection of common behavioral and psychological characteristics exhibited in women who repeatedly are physically and emotionally abused over a prolonged length of time by the dominant male figure in their lives." *State v. B.H.*, 183 *N.J.* 171, 182, 870 *A.*2d 273 (2005) (citation omitted). Evidence of the syndrome is admissible, typically in self-defense cases, to "explain[ ] conduct exhibited by battered women toward their abusers." *Id.* at 183, 870 *A.*2d 273. The syndrome helps our understanding of "why a woman remains in an abusive relationship" and why an "abused woman may become conditioned into believing that she is powerless to escape from the abuse." *Ibid.* (citations omitted).

Evidence of Battered Women's Syndrome certainly was admissible at sentencing and, at least, would have permitted an argument in support of mitigating factor number four: "There were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense." *N.J.S.A.* 2C:44–1(b)(4). In addition, defense counsel did not present four other mitigating factors for which there was evidential support: "The defendant acted under a strong provocation," *N.J.S.A.* 2C:44–1(b)(3); "The victim of the defendant's conduct induced or facilitated its commission," *N.J.S.A.* 2C:44–1(b)(5); "The defendant's conduct was the result of circumstances unlikely to recur," *N.J.S.A.* 2C:44–1(b)(8); and "The character and attitude of the defendant indicate that [she] is unlikely to commit another offense," *N.J.S.A.* 2C:44–1(b)(9).

Defense counsel's failure to bring relevant information in his file to the attention of the trial court so that the court could independently identify and weigh mitigating factors cannot be ascribed to strategy or reasonable professional judgment, particularly given

that the plea agreement on its face did not prohibit defense counsel from conveying such information.

Nevertheless, defense counsel may have believed himself handcuffed by the restrictive plea agreement. At sentencing, after simply stating that his hands were "somewhat tied" by the agreement, defense counsel offered no rebuttal to the prosecutor's forceful presentation, no mitigation evidence, and no explanation for why his client would resort to killing her husband. Of course, the restrictions in the plea agreement, forbidding defense counsel from arguing for a sentence less than thirty years or that the mitigating factors outweighed the aggravating factors, may have left him with the sense that any effort would be futile. Although defense counsel reminded the court of its independent responsibility to determine the appropriate sentence, the court's sentence—with little elaboration—merely echoed the terms of the agreement. Indeed, that is clearly revealed in the final words on the judgment of conviction: "This was a negotiated plea agreement between the Prosecutor and the defendant. It appears fair and in the interests of justice, the Court is imposing the recommended sentence."

Significantly, the Burlington County Prosecutor, who appeared before this Court at oral argument, candidly admitted that the restrictive plea agreement in *Hess* was a one-time event for his office—it had never been used before or after that case. Thus, Marie Hess, the killer of a police officer, fell into a universe of one. In response to the question, "What's the purpose of muzzling the defense attorney?", the Prosecutor responded, "To ensure that [the thirty-year sentence] in fact would be the sentence that was imposed."[5] Less than a year after defendant's sentence, the

---

[5] The following colloquy occurred at oral argument:

The Court: Are you afraid that if the defense attorney argues the appropriate mitigating factors the judge will not somehow give the appropriate sentence?

Prosecutor: There's always a concern, Justice, in a plea agreement that the court may undercut the agreement and that occurs very rarely but it does occur.

Appellate Division in *State v. Briggs, supra,* expressly prohibited the type of gag provision in the plea agreement that muzzled defendant's attorney at sentencing.

We now turn to the propriety of the plea agreement employed and assess whether it denied defendant the effective assistance of counsel.

## D.

Our jurisprudence makes clear that the State cannot insist on a term in a plea agreement that would vitiate the court's ability to exercise discretion in sentencing. "[A] criminal sentence is always and solely committed to the discretion of the trial court to be exercised within the standards prescribed by the Code of Criminal Justice." *State v. Warren,* 115 *N.J.* 433, 447, 558 *A.*2d 1312 (1989) (citation omitted). That discretion cannot "be encumbered" by giving the prosecutor a stranglehold over the sentencing determination. *Id.* at 447–48, 558 *A.*2d 1312.

In *State v. Warren,* we specifically disapproved of the plea-bargaining practice that enabled a prosecutor to withdraw a negotiated guilty plea if the trial court imposed a sentence more lenient than the one recommended by the prosecutor in the plea agreement. *Id.* at 442, 449, 558 *A.*2d 1312. Our rejection of this practice was premised on several grounds. We found that "the negotiated-sentence practice constitutes an impermissible constraint on the sentencing discretion of trial courts" under New Jersey's Code of Criminal Justice and Court Rules. *Id.* at 446, 558 *A.*2d 1312. The negotiated-sentence practice undermined the trial courts' independent responsibility to identify and weigh the aggravating and mitigating factors in fixing a just sentence. *Id.* at 447–50, 558 *A.*2d 1312. We also believed that the important goal of sentencing uniformity would be subverted by permitting the prosecutor "to impinge in this way on the court's independent discretion." *Id.* at 449, 558 *A.*2d 1312.

Significantly, in this case, the Prosecutor's statement at oral argument made clear that the purpose of the gag provision in the

plea agreement was to do an end run around Warren. The Prosecutor explained that the intent of the gag provision was to minimize the possibility that the sentencing court would "undercut" the sentencing provisions of the plea agreement.

In *State v. Briggs,* 349 *N.J.Super.* 496, 501, 793 *A.*2d 882 (App.Div.2002), the Appellate Division extended the core principles of *Warren* and precluded the type of restrictive plea agreement found in the case before us. The defendant in *Briggs,* who had been indicted for murder, pled guilty to aggravated manslaughter pursuant to a negotiated plea agreement that "provided that 'defense counsel agrees not to request a sentence of less than twenty years.'" *Id.* at 498, 793 *A.*2d 882. The defendant received an eighteen-year prison term subject to NERA. *Ibid.* The panel held "that the restriction in the plea form deprived defendant of effective assistance of counsel during a critical stage of the criminal proceeding." *Ibid.*

To support its holding that the restriction on defense attorney's advocacy constitutionally infringed on the right to counsel, the panel cited to *Herring v. New York,* 422 *U.S.* 853, 857, 95 *S.Ct.* 2550, 2553, 45 *L.Ed.*2d 593, 598 (1975), which struck down a state law prohibiting defense counsel from giving a summation in a bench trial, and *State v. Fusco,* 93 *N.J.* 578, 586–87, 461 *A.*2d 1169 (1983), which struck down a court order prohibiting counsel and client from discussing, during an overnight recess, testimony the client had given during trial. *Id.* at 500–01, 461 *A.*2d 1169.

*Briggs* noted that "the ability of counsel to provide a meaningful argument at sentencing, even in a case that appears 'open and shut,' is no less important than the opportunity to give a summation in a nonjury case." *Id.* at 501, 793 *A.*2d 882. It is at the critical stage of sentencing that counsel can make "a vigorous argument regarding mitigating and other circumstances, hoping to personalize defendant in order to justify the least severe sentence under the Criminal Code." *Ibid.* The *Briggs* panel believed that "there can be no doubt that a defense attorney must have an unfettered right to argue in favor of a lesser sentence than that

contemplated by the negotiated plea agreement." *Ibid.* The panel reversed and remanded for a new sentencing because it was unable to say "with confidence that the restriction upon defense counsel did not affect her ability to present a cogent and meaningful argument at sentencing." *Id.* at 503, 793 A.2d 882.

The intersection between *Warren* and *Briggs* is apparent. A plea agreement that prevents a defense attorney from presenting or arguing mitigating evidence to the sentencing court deprives the court of the information it needs to faithfully carry out its unfettered obligation to identify and weigh the appropriate sentencing factors. The unhindered adversarial process at sentencing allows the court to be fully informed about all the evidence and factors that will lead to a just sentence. A lopsided presentation by the State, and the virtual gagging of defense counsel, does not accomplish that goal.

As the State points out, *Briggs* was decided on direct appeal and the present case comes to us on an application for post-conviction relief. Nevertheless, the principles set forth in *Briggs* were not new or a break with precedent, and indeed those principles flowed directly from *Warren* and decisional law affirming the right to effective counsel at sentencing. *See, e.g., McConnell v. Rhay,* 393 *U.S.* 2, 4, 89 *S.Ct.* 32, 34, 21 *L.Ed.*2d 2, 4 (1968) ("The right to counsel at sentencing must, therefore, be treated like the right to counsel at other stages of adjudication."). The manner in which defense counsel seemingly interpreted the restrictive plea agreement in this case clearly was antithetical even to the right of allocution at sentencing. *Rule* 3:21–4(b) allows the defendant "to present any information in mitigation of punishment." Yet mitigation evidence was withheld from the sentencing court.

Neither the State nor amici Attorney General challenge the underlying legitimacy of *Briggs.* We affirm the principles set forth in *Briggs.* Our jurisprudence does not permit restrictions on the right of counsel to argue for a lesser sentence, or to argue against an aggravating factor or for a mitigating factor, or how the factors should be balanced, as this would deprive defendants of the

needed advocacy of their attorneys and deny our courts the needed insight to administer justice. *Briggs* is consistent with and a natural extension of *Warren.*

██ Putting aside defense counsel's failure to object to the restrictions in the plea agreement at the time of sentencing, perhaps out of fear that the downgrade to aggravated manslaughter would be jeopardized, the failure to present and argue the mitigating evidence can only be explained as attorney dereliction. In the end, the restrictive plea agreement helped to fuel the breakdown of the adversarial process in this case. The net effect of counsel's abdication of his role as an advocate was that the sentencing court was deprived of information and arguments that might well have led it to impose a lesser term.[6] The sentencing court heard the prosecution's impassioned account, and from the defense a deafening silence.

We find that the failure to present mitigating evidence or argue for mitigating factors was ineffective assistance of counsel—even within the confines of the plea agreement. Defendant's attorney was not functioning as the "counsel" guaranteed by either our Federal or State Constitution. *See Strickland, supra,* 466 *U.S.* at 687–88, 104 *S.Ct.* at 2064–65, 80 *L.Ed.*2d at 693–94; *Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336. Based on both the evidence and argument withheld from the sentencing court, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698; *accord Loftin, supra,* 191 *N.J.* at 197–98, 922 *A.*2d 1210; *Briggs, supra,* 349 *N.J.Super.* at 503, 793 *A.*2d 882 ("[W]e cannot say with confidence that the restriction upon defense counsel did not affect

---

[6] The trial court never referred to or rejected that portion of the presentence report—taken from defendant's first statement to the police—in which defendant detailed incidents of abuse and violence committed by her husband. The State and defendant entered no factual stipulations concerning the relationship between defendant and her husband.

her ability to present a cogent and meaningful argument at sentencing.").

We need not pass on the retroactive application of *Briggs*. At a new sentencing hearing sometime in the future, the principles of *Briggs* will apply. For the reasons already expressed, the restrictions in the plea agreement are void. The striking of the terms of the plea agreement places in doubt whether there was a meeting of the minds between the parties. Therefore, the plea agreement itself is void unless the State wishes to adhere to it without the offending provisions.[7] The plea may be vacated at the option of the State.[8] Should that occur, the parties are free to negotiate a new plea agreement, or the State can proceed to trial. If there is a guilty plea or a conviction after trial, at the new sentencing hearing defendant will have the opportunity to introduce mitigation evidence and argue that the mitigating factors outweigh the aggravating factors and argue for a lesser sentence.

We still must address whether defense counsel was constitutionally ineffective in failing to object to the victim-impact evidence, in particular the video tribute to the life of Officer James Hess and the in-court statement of Detective Simmons. The admissibility of that video is vigorously challenged by defendant.

---

[7] Defendant only seeks a new sentencing hearing.

[8] We note that both the PCR court and the Appellate Division were laboring under certain misimpressions regarding either the law or the facts. The PCR court mistakenly believed that the finding of a mitigating factor is solely a matter of discretion for the trial court. However, in *State v. Dalziel*, 182 *N.J.* 494, 504–05, 867 *A.*2d 1167 (2005), we held that if a sentencing court finds that a mitigating factor is supported by evidence in the record, then that factor "must be part of [its] deliberative process." *See State v. Blackmon*, 202 *N.J.* 283, 297, 997 *A.*2d 194 (2010) (noting that "mitigating factors that are suggested in the record, or are called to the court's attention, ordinarily should be considered and either embraced or rejected on the record"). Moreover, one of the reasons given by the Appellate Division for affirming the PCR court's denial of relief was defendant's failure to present expert testimony in support of her Battered Women's Syndrome claim. But defendant, in fact, presented the sixteen-page report of Dr. Hughes that concluded that defendant was a battered woman.

## V.

Crime victims are accorded the right to be heard before and at the time of the sentencing of a defendant. *See N.J.S.A.* 52:4B–34 to –38 (Crime Victim's Bill of Rights); *N.J.S.A.* 2C:44–6(b)(3); *see also State v. Blackmon,* 202 *N.J.* 283, 298–99, 997 *A.*2d 194 (2010) (detailing history of victims' rights in criminal proceedings). In an aggravated-manslaughter case, such as this one, a family member may provide a statement to be included in the presentence report describing "the effect of the crime upon the victim's family." *N.J.S.A.* 2C:44–6(b)(3). The family of the victim also has the right "[t]o make, prior to sentencing, an in-person statement directly to the sentencing court concerning the impact of the crime." *N.J.S.A.* 52:4B–36(n). That right is conferred to "the nearest relative of the victim of a criminal homicide." *N.J.S.A.* 52:4B–37. Additionally, "[i]n any homicide prosecution the victim's survivor may display directly to the sentencing court at the time of this statement a photograph of the victim taken before the homicide." *N.J.S.A.* 52:4B–36(n).

At sentencing, no one questions that a family member can make a statement about a homicide victim or present photographs or even a video showing the victim as he or she lived in the time before his or her death. The issue is whether there are any limits to the type of video that can be displayed at sentencing.

Our jurisprudence concerning victim-impact statements has developed in the context of capital cases in which juries, not judges, were required to decide whether to return a death sentence. *See, e.g., State v. Koskovich,* 168 *N.J.* 448, 501, 776 *A.*2d 144 (2001) (refusing to establish *"per se* prohibition against the inclusion of poetry" but expressing "concern about the emotional nature of poetry and similar forms of expression"); *State v. Muhammad,* 145 *N.J.* 23, 48, 55, 678 *A.*2d 164 (1996) (noting that victim-impact statements "should be limited to statements designed to show the impact of the crime on the victim's family and to statements that demonstrate that the victim was not a faceless stranger," but

"should be factual, not emotional, and should be free of inflamma-
tory comments or references").

Undoubtedly, concerns over prejudicial victim-impact state-
ments, including photographs and videos, are less pronounced
when a judge rather than a jury is imposing sentence. *See
Blackmon, supra,* 202 *N.J.* at 303, 997 *A.*2d 194. Nevertheless,
judges, no less than jurors, are susceptible to the wide range of
human emotions that may be affected by irrelevant and unduly
prejudicial materials. We are fully aware that judges, who are the
gatekeepers of what is admissible at sentencing, will have viewed
materials that they may deem non-probative or unduly prejudicial.
We have faith that our judges have the ability to put aside that
which is ruled inadmissible. However, both the bar and bench
should know the general contours of what falls within the realm of
an appropriate video of a victim's life for sentencing purposes.

Other jurisdictions that have addressed the issue, albeit in the
capital context, provide some direction to us. Courts have found
victim-impact videos permissible when they are short in duration
and when they do not include any sort of "special effects" such as
narration or evocative music. *See, e.g., People v. Brady,* 50
*Cal.*4th 547, 113 *Cal.Rptr.*3d 458, 236 *P.*3d 312, 337-38 (2010)
(approving four-minute victim-impact video that depicted "a rather
ordinary event" in victim's life and that "was not enhanced by
narration, background music, or visual techniques designed to
generate emotion"), *cert. denied,* —— *U.S.* ——, 131 *S.Ct.* 2874, 179
*L.Ed.*2d 1191 (2011); *People v. Dykes,* 46 *Cal.*4th 731, 95 *Cal.
Rptr.*3d 78, 209 *P.*3d 1, 48 (2009) (finding eight-minute video
depicting victim shortly before his death admissible because it did
not constitute "memorial" or "tribute"), *cert. denied,* —— *U.S.*
——, 130 *S.Ct.* 1088, 175 *L.Ed.*2d 909 (2010).

Alternatively, courts have expressed disfavor for victim-impact
videos that are too lengthy, depict childhood pictures of adult
victims, or are accompanied by evocative music. *See, e.g., United
States v. Sampson,* 335 *F.Supp.*2d 166, 192 (D.Mass.2004) (discuss-
ing preclusion of victim-impact video thirty minutes in length

featuring pictures "from birth to college … set to poignant music"), *aff'd,* 486 *F.*3d 13 (1st Cir.2007), *cert. denied,* 553 *U.S.* 1035, 128 *S.Ct.* 2424, 171 *L.Ed.*2d 234 (2008); *Salazar v. State,* 118 *S.W.*3d 880, 882–85 (Tex.Ct.App.2003) (vacating sentence rendered due to seventeen-minute victim-impact video containing 140 still photographs that spanned entirety of victim's life, including childhood, and was set to songs such as "River" by Enya and "My Heart Will Go On" by Celine Dion); *see also People v. Prince,* 40 *Cal.*4th 1179, 57 *Cal.Rptr.*3d 543, 156 *P.*3d 1015, 1093 (2007) (expressing concern over videos that "last[ ] beyond a few moments," that "emphasize[ ] the childhood of an adult victim, or [that are] accompanied by stirring music"), *cert. denied,* 552 *U.S.* 1106, 128 *S.Ct.* 887, 169 *L.Ed.*2d 742 (2008).[9]

 The professionally produced seventeen-minute video entitled "A Tribute to Officer James Hess" played at sentencing in this case includes features that have been specifically disapproved by courts in other jurisdictions: childhood photographs and music likely to appeal solely to emotion and engender undue prejudice. The video displays approximately sixty still photographs and four home-video clips of the victim in various activities and phases of his life. The video includes photographs of the victim's childhood and his tombstone and a television segment covering his funeral. Three poems scroll over the photographs and video clips. The video is scored to popular, holiday, country, religious, and military music. The State provided the victim-impact video in advance to both the trial court and defense counsel. This practice should be followed in the future because it permits a vetting of the video before it is played in court.

---

[9] The Texas Court of Criminal Appeals expressed its view of the "enormous" prejudicial effect of the adult victim's life videotape in *Salazar:* "[T]he implicit suggestion is that [the defendant] murdered this angelic infant; he killed this laughing, light-hearted child; he snuffed out the life of a first-grade soccer player and of the young boy hugging his blond puppy dog. The danger of unconsciously misleading the jury [was] high." *Salazar, supra,* 118 *S.W.*3d at 884 (latter alteration in original) (quoting *Salazar v. State,* 90 *S.W.*3d 330, 337 (Tex.Crim. App.2002) (remanding *Salazar* to court of appeals for harmless-error analysis)).

 In this case, defense counsel should have objected to the video, and his failure to do so cannot be considered strategic or reasonable. The music and the photographs of the victim's childhood and of his tombstone, and the television segment about his funeral do not project anything meaningful about the victim's life as it related to his family and others at the time of his death. They should have been redacted from the video because they contain little to no probative value, but instead have the great capacity to unduly arouse or inflame emotions. Although we do not believe that the introduction of the video, alone, had the capacity to alter the outcome of the sentence, on remand the video should accord with the prescriptions in this opinion.

We cannot set forth an exhaustive catalogue of what is and is not permissible in a video, other than to say how this video exceeded permissible bounds. We in no way intend to limit the right of family members to present photographs and videos within a reasonable period before the death of the victim, or to express themselves in the ways they see fit. For example, we do not suggest that a family member could not read a poem in court.

Clearly, the victim's sister had a right to speak to the court at sentencing. Family members have the right to describe the depths of their loss without a filter on their thoughts. But there are limits. An overly lengthy video, baby photographs of an adult victim, and a video scored to religious and pop music do not advance any legitimate objective even against the broad contours of the Victims' Bill of Rights. Ultimately, the trial court must be guided by the relevant aggravating and mitigating factors in determining the appropriate sentence.

 Furthermore, although Detective Simmons does not meet the statutory definition of family member under the Victim's Bill of Rights, the court has discretion whether to allow others to speak at sentence. *See Blackmon, supra,* 202 *N.J.* at 299, 997 *A.*2d 194. Detective Simmons, it appears, made the same statement in open court that he provided earlier in a letter to the sentencing judge. No objection was made to his addressing the

court. Because the court had already read Detective Simmons's letter, its oral presentation would not likely have changed the outcome. On remand, the sentencing court should consider anew the propriety of Detective Simmons's making a statement in open court if he is offered the opportunity to do so.

## VI.

For the reasons expressed, we reverse the Appellate Division, which affirmed the denial of defendant's petition for post-conviction relief. We conclude that defendant was denied her constitutional right to the effective assistance of counsel. Article I, Paragraph 10 of the New Jersey Constitution, *see Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336, and our state-court decisional law provide an independent state ground for our decision, *see Warren, supra,* 115 *N.J.* at 446–49, 558 *A.*2d 1312; *Briggs, supra,* 349 *N.J.Super.* at 500–03, 793 *A.*2d 882.

Because the plea agreement's restrictions on defense counsel's right to argue for a lesser sentence are void, those terms must be stricken from the agreement. Defendant has sought only a new sentencing hearing. But in the absence of the original plea agreement's terms, there may be no meeting of the minds between the State and defendant. Therefore, the State is free to proceed to a new sentencing hearing without the offending provisions or to vacate the plea. This case is remanded for proceedings consistent with this opinion.

Justice RIVERA–SOTO, dissenting.

Over a decade ago, defendant Marie Hess was indicted for a heinous crime: the cold-blooded, first-degree murder of her police officer husband while he slept, a charge that exposed her to up to life in prison, with a minimum of thirty years during which she would not be eligible for parole, *N.J.S.A.* 2C:11–3(b)(1). Defendant entered into a negotiated plea agreement that meaningfully reduced her penal exposure: she agreed to plead to and in fact pled to the lesser crime of first-degree aggravated manslaughter,

in violation of *N.J.S.A.* 2C:11–4(a), with a recommendation of thirty years' imprisonment subject to the provisions of the No Early Release Act (NERA), *N.J.S.C.* 2C:43–7.2, pursuant to which she would become eligible for parole after serving twenty-five and one-half years.

That plea agreement was crafted with great care between defendant and the State; each side sought advantages and made willing, knowing and informed concessions to achieve those advantages. As comprehensively memorialized in an April 5, 2001 letter from the State to defendant's counsel,

> the State sought [defendant]'s cooperation to assist her late husband's family (as the "victim-survivors" of the homicide of James B. Hess) in their family and individual grieving processes. Specifically, *[the State] requested that [defendant] convey the truth as to the circumstances which led to her taking the life of her husband, and provide a truthful factual recitation of the manner in which she carried out the homicide.*

> As [the State] indicated to [defendant] and you, this was a prerequisite to any consideration being given to a negotiated plea by [the State], as it was [the State's] view as a result of [its] investigation that this, quite simply, was a murder case. With the applicability of [NERA] to this crime[,] as well as the normal sentencing options for murder (either life imprisonment with a 30[-]year parole disqualifier or a 30[-]year sentence without the possibility of parole), it was [the State's] position that an agreement would encompass a plea to Murder with a 30[-]year term of imprisonment without parole. [The State], of course, was aware that you, as the advocate for [defendant], always hoped that [the State's] position would be altered to the benefit of [defendant].

> . . . .

> [I]n light of [defendant's] cooperation[, the State] will extend the following plea offer: *the State would amend the single count of the above-captioned indictment charging Murder, in violation of N.J.S.A. 2C:11–3[,] to charge Aggravated Manslaughter, in violation of N.J.S.A. 2C:11–4[ (]a[) ]. As to sentencing, [defendant] must acknowledge the applicability of NERA . . . to this crime. Further, [defendant] must acknowledge that she is pleading guilty with the understanding that she will receive a sentence of 30 years in the New Jersey State Prison, and, further acknowledge, that as part of that sentence she will receive a period of parole ineligibility of 25 ½ years. Further, [defendant] must agree that neither you, on her behalf, nor she will affirmatively seek a lesser term of imprisonment from the Court. Additionally, [defendant] will affirmatively agree not to appeal her judgment of conviction.*

> It is [the State's] intention, through this plea agreement, to provide a benefit to [defendant] for her cooperation in allowing a plea to Aggravated Manslaughter for a crime, which she has clearly indicated, was a purposeful murder. [The State] is

reducing by 4½ years the mandatory minimum for murder, i.e.[,] thirty years without parole, as the benefit she derives for her cooperation.

[Defendant] is, in turn, conceding the applicability of NERA to the maximum term of imprisonment for the crime of Aggravated Manslaughter. Further, she is conceding that the aggravating factors under *N.J.S.A.* 2C:44–1[ (]a[) ] so preponderate over the mitigating factors set forth in *N.J.S.A.* 2C:44–1[ (]b[) ] as to make the maximum term of 30 years appropriate. [The State] would also indicate that [it] is aware that we cannot bind the Court to sentence in this fashion pursuant to the principles enunciated in *State v. Warren,* 115 *N.J.* 433 [558 *A.2d* 1312] (1989), and it is not our intention to do so. However, we believe it permissible to bind [defendant] to this agreement.

Finally, pursuant to *R.* 3:9–3(c), it is our position that you and [the State] disclose this term of agreement to the Court and seek the Court's concurrence in [the] same.

[ (first emphasis supplied; remaining emphasis in original).]

Defendant reaffirmed the terms of that plea agreement by a written, initialed and signed plea form that referenced, attached and incorporated the April 5, 2001 letter. Moreover, at the plea hearing, during which defendant was present and testified under oath, defense counsel stated clearly that "[n]either [he] nor [the prosecutor] will argue to the [c]ourt that any sentence, other than that which is set forth in the agreement, is appropriate. That, of course, leaves the [c]ourt to impose what is the appropriate sentence." In sum, as set forth in the detailed plea agreement, the State did its part: it amended and downgraded the charge from first-degree murder to first-degree aggravated manslaughter, and requested the imposition of a thirty-year sentence, subject to NERA. Defendant also did her part: on April 16, 2001, she pled guilty to the lesser offense of first-degree aggravated manslaughter. Satisfying itself that defendant was entering into that plea knowingly, voluntarily and intelligently, the court directly addressed defendant as follows:

[Defendant], you obviously have heard everything that I have heard here in open court this afternoon. And it's my understanding that you are going to make certain admissions with respect to the homicide of your late husband.

And that point I want to make to you is you have been charged with … purposely and knowingly committing a murder which would carry with it, if you are convicted, a minimum of actually serving 30 years in State Prison, possibly longer, but certainly that at the very least.

You've been offered the opportunity to plead to aggravated manslaughter which is, based on the agreement that I've heard in your presence, a little bit less than that ... 25 ½ years actually minimum time in jail.

It's not to say that if I were to sentence you in accordance with your agreement, 85 percent of 30 years, that you wouldn't serve more than the bare bones minimum, but certainly you couldn't service more than the maximum.

I tell you those things because you need to have decided, even before you got here, but still here, whether or not, under all the circumstances, that makes sense to you because your alternative is this.

You can go to trial. The State has the obligation to prove, beyond a reasonable doubt, that you are guilty of the charge that the State has brought against you. And, of course, they can do that only by bringing witnesses to court to testify against you.

And then [defense counsel] would have every opportunity to cross-examine those witnesses, in an attempt to breakdown what they're telling the jury, in his attempt to be of help to you because it may well be that you would be found not guilty.

Only you know what happened and you know what the strength of the State's proofs are. And one would assume that you and [your defense counsel] have had ample opportunity to discuss those things. Because once the State has concluded its case, you then have an opportunity to present your part of the case. You could bring witnesses to court that you believe would be helpful to you.

You, of course, could get on the stand and tell whatever story you think would be helpful to you. You could have a trial and refuse to take the stand. And when I say refuse, what I mean is you could choose not to get on the stand because you don't have any obligation whatsoever to get on the stand and tell any story at all.

[The prosecutor] could not tell the jury that, ["]well, ladies and gentlemen, you should convict this lady because she's not telling any story different than what I told you through my witnesses.["] He does not have the right to go th[ere] because you have the constitutional right to remain silent at your own trial. You have no obligation at all to get on the stand. And your decision to have a trial and not get on the stand and testify cannot be used, in any way, against you.

Once defendant acknowledged she understood those instructions, the trial court reviewed defendant's plea form with her. She acknowledged under oath that she had reviewed every question on the plea form with her counsel; that she understood all of the questions; that she had answered them truthfully; that she had initialed and signed the form in several places; that she had acknowledged the application of NERA to her plea sentence; that, although the court retained "judicial discretion to sentence [her] to less than" what the plea agreement provided, the court did not "want to give [defendant] any false hopes or any hopes at all that [it] would sentence [defendant] to less than" the agreed-on sen-

tence; that she had not been threatened or coerced to enter into the plea agreement; that she had entered into the plea agreement voluntarily; that no additional promises had been made; that she was entering into the plea agreement because it represented "an opportunity, realistically, to serve less time than [defendant] might otherwise be likely to serve[;]" that she was not "under the influence of any medicine, prescribed or not, drugs, alcohol, or anything at all that might make it difficult for [her] to make a wise choice[;]" that she had "had a full opportunity to speak with [her defense counsel] about what is in [her] best interest[;]" that she had "had enough opportunity" to speak with her counsel; that she had had sufficient opportunity to question her counsel and to receive answers to those questions; that she was satisfied with her counsel's advice as her lawyer; that she fully understood the plea proceedings; that she had the right to have her guilt adjudicated in a trial; and that she was waiving that right.

After defendant provided a factual basis for having intentionally shot and killed her husband while he slept, the court declared itself satisfied that "there is a sufficient factual basis for aggravated manslaughter" as the facts as admitted by defendant "show[ed] an extreme indifference to human life[.]" The court spoke to defendant directly, noting that, although the court understood "what [defendant's] plea agreement is[,]" the court had made "very clear that [defendant] should expect nothing less than that." Emphasizing the point, the court stated "once again, don't count on anything different[.]" Accepting defendant's plea to first-degree aggravated manslaughter, the court ordered a pre-sentence report and scheduled a sentencing hearing.

During the June 22, 2001 sentencing hearing, the State presented a video prepared by the victim's family, and one of the decedent's fellow police officers read aloud a victim-impact statement from the victim's police department that already had been sent to the sentencing judge.[1] Tellingly, defendant interposed no

---

[1] The majority unfairly and inaccurately portrays both the video and the victim-impact statement: it pejoratively describes the videotape as a "video of

objection to either the video or to the reading of the victim-impact statement aloud in open court. In mitigation, defendant argued as follows:

As your Honor knows from the plea agreement and the letter that accompanies it, my hands are somewhat tied. [Defendant] knowingly, intelligently and voluntarily entered into a plea agreement and it was as [the prosecutor] put it: after many, many hours and days of negotiation. That plea agreement does not[,] however[,] bind this Court. It cannot. We cannot and will not ever be able to bind the Court in terms of a plea agreement; *State v. Warren* is clear on that. The Court must make an independent evaluation of the defendant, each and every defendant, the aggravating and mitigating factors and consider what sentence is appropriate regardless of what [defendant] or I or [the prosecutor] think might be appropriate or might be appropriate to recommend to this court.

I cannot, pursuant to this plea agreement, ask the court to sentence [defendant] to less than [what] was agreed to. I can ask the Court to make an independent evaluation of the aggravating and mitigating factors recognizing the lack of any prior criminality, recognizing all of the appropriate factors, and to consider whether or not this Court believes in this particular instance that a 30[-]year sentence for a 34-year old woman is appropriate under the circumstances.

I'm bound by my agreement. There's not more I can do but leave it to the Court, your Honor's discretion and hope that the Court will find the appropriate sentence given these circumstances.

Given the opportunity to address the sentencing court directly, defendant did not ask for a lesser sentence; instead, she apologized for her actions and asked for forgiveness. She raised nothing else: neither that she claimed to have been a battered woman or otherwise suffering from diminished capacity, nor that the terms of her plea agreement restricting her from seeking a lesser sentence were somehow unlawful or improper.

After carefully identifying and weighing the relevant aggravating and mitigating factors, the sentencing court addressed the particular terms of defendant's plea agreement. It noted that defense counsel "has quite correctly pointed out that[,] while there is a plea bargain in this case, he has agreed not to argue for [a

---

the victim's life set to popular and religious music[,]" and it mischaracterizes the victim-impact statement as "an invective-filled victim-impact statement given by a police officer who served with defendant's husband." *Ante* at 129, 23 *A.*3d at 376. The former description is unnecessary; the latter description is plainly and unfairly incorrect, and does not comport with the statement's content.

lesser] sentence, but I am in my discretion authorized to give a lesser sentence; clearly, that is the law." It reasoned, therefore, that although the court was "authorized to sentence less than the plea agreement, this is the kind of case where [defendant] certainly could have been sentenced to more had she gone to trial on the charge as originally brought and been found guilty." Declaring itself "satisfied therefore that the plea agreement as it was made is fair, just, and in the interest of justice[,]" the court sentenced defendant pursuant to that agreement. As agreed in the plea bargain, defendant did not appeal her conviction and sentence, although it had been made clear to defendant that she could appeal her conviction and/or sentence, albeit at the risk of losing the benefits of her plea bargain.

Unwilling to take that risk, more than four years later, on September 7, 2005, defendant instead filed a pro se petition for post-conviction relief, alleging ten separate grounds, running the gamut from newly-discovered "evidence," to the ineffective assistance of both trial and appellate counsel.[2] In an amended verified petition for post-conviction relief filed on February 20, 2007 by counsel on defendant's behalf, she addressed solely the sentence imposed, underscoring that she did "not contest the conviction itself and does not ask the court to set aside the conviction for aggravated manslaughter[;]" defendant asked that her sentence "be set aside and the case set down for a new sentencing hearing." In support, she alleged four separate grounds:

1. that "she was denied effective assistance of counsel at the sentencing hearing in that counsel failed to argue applicable and supportable mitigating factors the court could have considered in sentencing [defendant], even if counsel did not specifically request a lesser sentence[;]"

2. that "she was afforded ineffective assistance of counsel at the sentencing hearing when counsel failed to object to the statement of Burlington Twp.

---

[2] As specifically provided in her plea bargain, defendant did not file a direct appeal from her conviction and sentence. She nevertheless has claimed she had contacted the Office of the Public Defender to prosecute her appeal, but that, without any explanation, "the appeal was never filed." Defendant has tendered no support for that allegation.

Detective Michael Simmons or to object to the showing of the videotape regarding [the victim] James Hess[;]"

3. that "the terms of the plea bargain deprived her of counsel at a critical stage in the proceedings in violation of her state and federal constitutional rights[;]" and,

4. that "the sentence imposed was manifestly excessive."

In partial response, the State tendered the certification of defendant's trial counsel, the attorney who had represented defendant in her plea negotiations, the entry of her plea and her sentencing. He certified that he had "represented defendant during extensive plea negotiations with the State, and we were eventually able to reach a negotiated plea agreement that was accepted by both my client and the State." He described the plea agreement as follows:

> Under this negotiated plea agreement, Count One of Indictment 2000-03-0203-I was amended to aggravated manslaughter, a first-degree offense with a maximum exposure of 30 years in prison. The State agreed to recommend a sentence of 30 years, 85% of that to be served before parole eligibility pursuant to NERA. In return, defendant and I agreed not to seek a lesser term of imprisonment at sentencing, and to stipulate that the aggravating factors, under *N.J.S.A.* 2C:44-1[ (]a[) ], so preponderated over the mitigating factors, under *N.J.S.A.* 2C:44-1[ (b) ], as to make the sentence of 30 years appropriate. Additionally, defendant agreed to waive her right to appeal.

He further certified that he had "had extensive discussions with defendant as to the meaning of all terms of the negotiated plea agreement." He stated that he had "advised [his] client that the State's offer was fair since her potential exposure at trial was much greater based on the facts and overwhelming evidence of her guilt." He also certified that "[d]efendant certainly understood that she was receiving the benefit of the plea agreement by having the indictment amended from first-degree murder to first-degree manslaughter and thus significantly reducing her potential exposure at sentencing."

Responding to defendant's allegations of ineffective assistance of counsel, defendant's trial counsel emphatically certified that "[a]t no time did I misstate or inaccurately convey either defendant's potential exposure at trial or the meaning of the terms of the negotiated plea agreement." He also certified that he had "discussed with the defendant the State's burden of proof, discovery

materials and obligations[,] and her potential exposure at trial as a first-degree offender if convicted[;]" that he "also discussed the potential aggravating and mitigating factors with the defendant, based on the discovery materials and the defendant's input and information as to the events and facts underlying her offense[;]" and that he had "discussed with defendant all plausible defenses, including defenses relating to domestic violence." Importantly, defendant did not rebut any of the assertions to which her trial counsel had certified.

On December 14, 2007, defendant's petition for post-conviction relief was denied. The court rejected all of defendant's contentions, finding that "[t]here is nothing presented by the defendant that would allow this [c]ourt to conclude that her [S]ixth [A]mendment rights, or any other rights, were violated by her willingness to enter into this agreement." It determined that defendant's concerns in respect of the admissibility of either the video or Det. Simmons's open-court reading of the victim-impact statement that already had been submitted to the court could and should have been presented on direct appeal, thereby placing both questions outside the reach of a petition for post-conviction relief. *See R.* 3:22-3 (providing that petition for post-conviction relief "is not, however, a substitute for appeal from conviction"); *R.* 3:22-4(a) ("Any ground for relief not raised in the proceedings resulting in the conviction ... or in any appeal taken in any such proceedings is barred from assertion in a proceeding [for post-conviction relief.]").

Defendant appealed and, in an unpublished opinion, the Appellate Division affirmed the denial of defendant's petition for post-conviction relief. Procedurally, it concluded that "[t]here is no question that defendant could have raised on direct appeal the arguments she submitted in her PCR petition[,]" and that "[d]efendant cannot assert that she was precluded from doing so by the plea agreement." It noted that "[d]efendant was clearly informed by the sentencing judge in accordance with *Rule* 3:9-3(d) that even though she agreed not to appeal, she still had that right, but

if she chose to do so, the State would have the right to withdraw the plea offer and reinstate the original charge."

Substantively, the Appellate Division also rejected defendant's attack on her plea agreement. Explaining that what defendant was doing was "asking the court to undercut the plea agreement[,]" it stated that it was "not persuaded that defendant established either prong of ineffective assistance of trial counsel." Noting that defendant's "challenge is to trial counsel's failure to enumerate potentially mitigating evidence at the sentencing hearing and failure to object to the presentation of allegedly improper victim impact evidence[,]" the panel concluded that "[e]ven if we were to assume such conduct was deficient, which we do not find it was, defendant fails to demonstrate, by a reasonable probability, the prejudice prong of" the two-prong test for determining whether counsel's assistance was ineffective. *See Strickland v. Washington*, 466 *U.S.* 668, 687, 694, 104 *S.Ct.* 2052, 2064, 2068, 80 *L.Ed.*2d 674, 693, 698 (1984) (adopting two-prong test for claims of ineffective assistance of counsel, that: (1) counsel's performance was insufficient and made errors that were so serious that counsel was not functioning effectively as guaranteed by the Sixth Amendment to the United States Constitution (ineffectiveness prong), and (2) defect in performance prejudiced defendant's rights to fair trial such that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (prejudice prong)); *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987) (adopting *Strickland* test in New Jersey).

After granting defendant's petition for certification,[3] *State v. Hess*, 203 *N.J.* 95, 999 *A.*2d 464 (2010), the majority now concludes

---

[3] The order granting defendant's petition for certification limited the issues to those raised by defendant save for those relating to the attorney-client privilege and the discovery of decedent's personnel file. As a result, and as identified in defendant's petition for certification, there are five remaining but overlapping issues. Retaining defendant's original numbering, they are: "1. Whether the defendant is entitled to a new sentencing hearing because the restrictive plea

that the Law Division's and Appellate Division's separate determinations sustaining her plea agreement and sentence are somehow constitutionally deficient. According to the majority, the effect of the plea agreement was that "defendant was denied her constitutional right to the effective assistance of counsel at sentencing[,]" and that "[d]efense counsel deprived the court of mitigating evidence that was necessary for a meaningful sentencing hearing." *Ante* at 129, 23 *A*.3d at 376. In the majority's view, "[t]hat alone so undermined the adversarial process that counsel no longer was serving in the role of an advocate as envisioned in our criminal justice system." *Ante* at 129, 23 *A*.3d at 376. It reasons that "the constraints embedded in the terms of the plea agreement—drafted by the State and accepted by defense counsel—denied the court of arguments that may have shed light on relevant sentencing factors and how they should be weighed." *Ante* at 129–30, 23 *A*.3d at 376. It therefore concludes that "[t]he terms of that plea agreement were incompatible with ... *State v. Warren*, 115 *N.J.* 433, 558 *A*.2d 1312 (1989), and ... *State v. Briggs*, 349 *N.J.Super.* 496, 793 *A*.2d 882 (App.Div.2002)," and that the plea deal terms "impinged not only on the role of counsel at sentencing, but also on the role of our courts as independent arbiters of justice." *Ante* at 130, 23 *A*.3d at 376. It additionally concludes that "defense counsel was constitutionally ineffective for failing to challenge the unduly prejudicial video tribute to the victim scored to popular and religious music." *Ante* at 130, 23 *A*.3d at 376–77.

I cannot agree.

---

agreement deprived her of [the] right to counsel at sentencing?[;]" 2. Whether the court erred in not granting defendant an evidentiary hearing on her Petition for Post-Conviction Relief?[;]" 3. Whether the defendant was denied the effective assistance of counsel at her sentencing hearing?[;]" 4. Whether the admission of the victim[-]impact statement of Detective Simmons and the videotape of the deceased was grossly prejudicial to the [d]efendant and necessitates a new sentencing hearing?[; and] 7. Whether cumulative errors by counsel amounted to the ineffective assistance of counsel and denial of fundamental fairness?

## I.

This appeal is based on defendant's petition for post-conviction relief. *See generally R.* 3:22–1 to –12 (setting forth rules for petitions for post-conviction relief). "Our post-conviction relief proceeding is the 'analogue to the federal writ of habeas corpus.' " *State v. Echols,* 199 *N.J.* 344, 357, 972 *A.*2d 1091 (2009) (quoting *State v. Harris,* 181 *N.J.* 391, 420, 859 *A.*2d 364 (2004)). Petitions for post-conviction relief are not a haven for sundry wayward claims; "[b]ecause post-conviction relief is not a substitute for direct appeal and because of the public policy to promote finality in judicial proceedings, our rules provide various procedural bars." *Ibid.* (citation and internal quotation marks omitted). "[A] petitioner may be barred from relief if the petitioner could have raised the issue on direct appeal but failed to do so, *Rule* 3:22–4; the issue was previously decided on direct appeal, *Rule* 3:22–5; or the petition was filed more than five years after the judgment or sentence that was imposed, *Rule* 3:22–12." *Ibid.* And, "[a]lthough our rules provide for certain exceptions to these general rules, we have emphasized that it is important to adhere to our procedural bars." *Ibid.* (citation omitted). Finally, "[t]he burden is on the petitioner to establish the right to relief by a preponderance of the credible evidence." *Ibid.* (citing *State v. Goodwin,* 173 *N.J.* 583, 593, 803 *A.*2d 102 (2002)).

Ineffective assistance of counsel claims raised on a petition for post-conviction relief are gauged under the *Strickland/Fritz* two-prong test, whereby

[u]nless both parts of the test are established, defendant's claim must fail. The first part of the test is satisfied by a showing that counsel's acts or omissions were outside the wide range of professionally competent assistance considered in light of all the circumstances of the case. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. As a result, there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. That presumption may be rebutted if defendant demonstrates that counsel's actions did not equate to sound trial strategy.

The court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. For that

reason, an otherwise valid conviction will not be overturned merely because the defendant is dissatisfied with his or her counsel's exercise of judgment during the trial.

The second part of the test is whether there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. That is, the challenged error must be so serious as to undermine the courts confidence in defendant's conviction.

[*Echols, supra*, 199 *N.J.* at 358–59, 972 *A.*2d 1091 (citations and internal quotation marks omitted).]

## II.

### A.

Stated in summary fashion, the majority proclaims as newly minted constitutional gospel that defense counsel's obligation to present mitigating factors at sentencing cannot be waived, even as a condition of a bargained-for plea agreement. Based on that novel theory, the majority voids the fundamental underpinnings of the bargain struck by defendant and the State. The majority's unapologetic dismantling of a decade-old carefully negotiated and constructed plea agreement presents the State with what is in fact no choice at all: either prosecute anew a now twelve-year-old murder case, or be forced to accept the negotiated aggravated manslaughter plea, forfeit all the benefits of that negotiated plea, and conduct a new sentencing hearing where defendant will be allowed to present proofs her plea agreement otherwise forbade.

The majority tethers its analysis to two cases: *Warren, supra,* and *Briggs, supra.* That mooring is illusory, as neither case is controlling here. *Warren, supra,* addressed circumstances quite different from those presented here; it grappled with a "negotiated sentence," that is, one where the State is permitted to "withdraw from the guilty plea if the sentence imposed is more lenient than that recommended by the prosecutor and contemplated by the plea agreement[.]" 115 *N.J.* at 437, 558 *A.*2d 1312. *Warren* specifically describes that practice as follows:

A negotiated sentence is one that the parties, the State and the defendant, understand must be imposed by the sentencing court in order to fulfill the plea bargain and, if it is not, the party whose sentencing expectations have been

disappointed, either the State or the defendant, would have the right to withdraw from the plea arrangement and insist on a trial. Such a negotiated sentence would constitute a material term of the plea bargain.
[*Ibid.*]

It couched the issue before it as follows: "Is it permissible for a sentencing court to accept a plea bargain that includes as a material term a negotiated sentence that enables the State to withdraw from the guilty plea and requires the defendant to go to trial if a sentence consistent with the negotiated sentence is not imposed?" *Id.* at 441, 558 *A.*2d 1312. It concluded that "there should be no implied authority to accept a guilty plea subject to the prosecutor's right to withdraw if the sentence imposed does not conform to the negotiated sentence." *Id.* at 442, 558 *A.*2d 1312. It so reasoned largely because "[t]he determination of a criminal sentence is always and solely committed to the discretion of the trial court to be exercised within the standards prescribed by the Code of Criminal Justice[,]" and "[t]hat discretion should not by implication be encumbered by augmenting the prosecutor's influence on the sentencing determination." *Id.* at 447–48, 558 *A.*2d 1312 (citation omitted).

It is beyond peradventure that defendant's plea agreement did not implicate a "negotiated sentence"; nothing in defendant's plea agreement authorized the State to withdraw from the plea bargain if a sentence less than what was agreed was imposed. On the contrary, the plea agreement specifically provided that both the State and defendant were "aware that we cannot bind the Court to sentence in this fashion pursuant to the principles enunciated in [*Warren, supra* ], and it is not our intention to do so. However, we believe it permissible to bind [defendant] to this agreement." This appeal, then, presents facts and circumstances entirely different from those considered in *Warren,* making it inapplicable here; indeed, this plea agreement was made specifically subject to and entirely consonant with *Warren.*

A like fate awaits the majority's reliance on *Briggs, supra,* where, pursuant to the plea agreement, " 'defense counsel agrees not to request a sentence of less than twenty years.' " 349 *N.J.Su-*

*per.* at 498, 793 *A.*2d 882. Although the *Briggs* panel held that "the restriction in the plea form deprived defendant of effective assistance of counsel during a critical stage of the criminal proceeding[,]" *ibid.*, it nevertheless conceded that, unlike the circumstances presented in this appeal, "[i]t is unclear how or why the restriction in the plea form that prohibited defendant from requesting a sentence of less than twenty years was included." *Id.* at 499, 793 *A.*2d 882.[4]

The bargained-for plea agreement reached in this case between defendant and the State reflected a sophisticated, deliberate and carefully nuanced balance between defendant's desire to minimize her penal exposure and the State's wish to provide closure to the victim's grieving family and friends. No doubt, the indictment for first-degree murder was well-founded. Defendant readily admitted in her plea colloquy that she intentionally selected a firearm that she knew would not misfire and for which she could use a speed-loader; that she wrapped the weapon in cloth to avoid leaving her fingerprints; that she approached her husband while he was asleep and shot him in the head, killing him; that she then left for work and did not return until several hours later; and that she did not call for help until after she had returned from work and was certain her husband was dead. In those circumstances— all of which the State was ready, willing and able to prove through competent evidence—defendant's conviction for first-degree murder, and the mandatory minimum thirty-years' imprisonment and

---

4 Further, *Briggs* was decided almost a year *after* defendant's conviction and sentence became final and unappealable, and any discussion of its holding having full retroactive effect—or, for that matter, *any* retroactive effect—is glaringly absent from that opinion or, for that matter, from the majority's analysis.

Moreover, *Briggs* was decided by the Appellate Division-our intermediate appeals court—whose decisions are not binding on this Court. *New Amsterdam Cas. Co. v. Popovich*, 18 *N.J.* 218, 224, 113 *A.*2d 666 (1955) (explaining that Appellate Division decisions are "not binding upon this court. [They are] not *stare decisis* in this court"); *see also J.D. Constr. Corp. v. Isaacs*, 51 *N.J.* 263, 272, 239 *A.*2d 657 (1968) ("We reserve our views on all expressions of the Appellate Division except to the limited extent we have indicated approval.").

maximum life imprisonment that conviction requires, appeared a near certainty. It was therefore logical and reasonable for defendant to seek to minimize her exposure by any legitimate means available.

On the other hand, the State was willing to downgrade its prosecution of defendant if she cooperated in "assist[ing] her late husband's family (as the 'victim-survivors' of the homicide of James B. Hess) in their family and individual grieving processes." In exchange for defendant "convey[ing] the truth as to the circumstances which led to her taking the life of her husband, and provid[ing] a truthful factual recitation of the manner in which she carried out the homicide[,]" the State allowed that defendant plead to the lesser charge of first-degree aggravated manslaughter subject to three conditions: that the State would recommend the imposition of a thirty-year term of imprisonment subject to NERA; that neither defendant nor her counsel would "affirmatively seek a lesser term of imprisonment from the Court[;]" and that she "affirmatively agree not to appeal her judgment of conviction."

Thus, unlike *Briggs,* there is a clear and unequivocal record here as to "how or why the restriction in the plea form that prohibited defendant from requesting a sentence of less than [thirty] years was included." *Id.* at 499, 793 *A.*2d 882. Also, *Briggs* focused on that defense counsel's failure to "advance any argument that, because of the preponderance of mitigating factors, a sentence substantially lower than [what was imposed] was merited[.]" *Id.* at 502, 793 *A.*2d 882. Again, that consideration is absent here as defendant, in her plea agreement, "conced[ed] that the aggravating factors ... so preponderate over the mitigating factors ... as to make the maximum term of 30 years appropriate." [5]

---

[5] *Briggs* seemingly also was influenced greatly by the appellate panel's attraction to the notion that the defendant may have been "a candidate for a downgraded sentence under *N.J.S.A.* 2C:44–1[ (]f[) ](2), which permits the court

## B.

Central to the majority's analysis is the hitherto unheard-of notion that a plea bargain never may restrict a defendant's ability to seek a sentence lower than the one recommended; the basis for that seemingly intractable rule apparently rests in the proposition that "[t]he determination of a criminal sentence is always and solely committed to the discretion of the trial court to be exercised within the standards prescribed by the Code of Criminal Justice[,]" and that such "discretion should not by implication be encumbered by augmenting the prosecutor's influence on the sentencing determination." *Warren, supra,* 115 *N.J.* at 447–48, 558 *A.*2d 1312 (citation omitted). *Warren* also states that "[s]uch limitations on prosecutorial influence over sentencing have long been understood and accepted in defining the prosecutorial role in criminal sentencing, and we entertain no doubt that this understanding is reflected in the current Code." *Id.* at 448, 558 *A.*2d 1312.

However noble they may appear, those pronouncements are needlessly and, in the context of the facts presented here, unconscionably overbroad. For example, Section 12 of the Comprehensive Drug Reform Act of 1986, *N.J.S.A.* 2C:35–12, specifically provides that, in respect of certain controlled dangerous substances prosecutions, the State and the defendant may enter into a "negotiated plea [that] provide[s] for a specified term of imprisonment[.]" In those instances, "the court at sentencing shall not impose a lesser term of imprisonment ... than that expressly provided for under the terms of the plea ... agreement." *Ibid.* In other words, when Section 12 applies, the parties—the State and

---

to sentence the defendant to a term appropriate to a crime one degree lower, if it is 'clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands.' " *Ibid.* Yet, as even the appellate panel in *Briggs* reluctantly conceded, "because of the legislative judgment to enhance the penalty for aggravated manslaughter, trial courts 'should be cautious' in downgrading sentences for such offenses." *Ibid.* (citation omitted).

the defendant—are authorized to bind the court as to the specific sentence to be imposed. Yet, that statute raises no constitutional infirmity in respect of a restriction on counsel to present meaningful arguments at sentencing. *State v. Stewart*, 136 *N.J.* 174, 179, 642 *A.*2d 942 (1994) (holding that "section 12 expressly prohibits a court from imposing a lesser term of imprisonment than that provided in the plea agreement"); *State v. Bridges*, 131 *N.J.* 402, 405–06, 621 *A.*2d 1 (1993) (same). If, at least in the context of illegal drug prosecutions, the State and a defendant can agree that the court is forbidden to impose a sentence less than the sentence agreed on in a plea bargain, then what principled rule of law prohibits those same parties from agreeing that the defendant, already having received the benefit of a reduced charge and its concomitant lesser penal exposure, will not seek a lesser sentence than the one set forth in the plea agreement? The answer is: none.[6]

---

[6] Further, in the federal system, the procedure by which the prosecution and the defense properly can enter into a valid and binding plea agreement that specifies that a specific sentence is to be imposed and binds the court if the plea is accepted is so much part of the fabric of their processes that it has been codified. *See Fed.R.Crim.P.* 11(c)(1)(C) (providing that prosecution and defendant may enter into plea agreement that defines that "a specific sentence or sentencing range is the appropriate disposition of the case" and that "such a recommendation or request binds the court once the court accepts the plea agreement"). If a plea agreement contains a *Rule* 11(c)(1)(C) limitation, the court's alternatives are limited to just two: either (1) accepting the plea and sentencing the defendant as provided in the plea bargain, or (2) allowing the defendant to withdraw his or her guilty plea. *See United States v. Cieslowski*, 410 *F.*3d 353, 363 (7th Cir.2005) (explaining that if the court "does not accept the sentencing agreement in its entirety, the defendant must be allowed to withdraw her guilty plea [as] the court does not have the power to retain the plea and discard the agreed-upon sentence"), *cert. denied*, 546 *U.S.* 1097, 126 *S.Ct.* 1021, 163 *L.Ed.*2d 866 (2006).

It is also quite usual in the federal system for the parties to stipulate to various sentencing factors under the *U.S. Sentencing Guidelines*, *see U.S. Sentencing Guidelines Manual* § 1A1.1, *et seq.* (2010)—many of which are comparable to the aggravating and mitigating factors under New Jersey law. *See N.J.S.A.*2C:44–1(a) (aggravating factors) and (b) (mitigating factors). That routine practice is a sign of sensible, sound lawyering, not ineffective assistance of counsel.

## C.

Plea bargaining has become an important and now indispensable commonplace of our criminal justice system. It "is a legitimate, accepted practice in the administration of criminal justice[and t]he system rests on the advantages both sides receive from it; and it depends on the good faith of both parties in carrying out the agreement struck—provided it is reasoned, fair, and approved by the trial court." *State v. Slater,* 198 *N.J.* 145, 161, 966 *A.*2d 461 (2009); *see also State v. Taylor,* 80 *N.J.* 353, 360–61, 403 *A.*2d 889 (1979) ("Plea bargaining has become firmly institutionalized in this State as a legitimate, respectable and pragmatic tool in the efficient and fair administration of criminal justice. Courts across the country have adopted plea bargaining as an appropriate accommodation of the conflicting interests of society and persons accused of crime and as a needed response to an ever-burgeoning case load." (citations omitted)). Of course, "[a] key component of plea bargaining is the 'mutuality of advantage' it affords to both defendant and the State." *State v. Means,* 191 *N.J.* 610, 618, 926 *A.*2d 328 (2007) (quoting *Taylor, supra,* 80 *N.J.* at 361, 403 *A.*2d 889 (internal quotation marks omitted)). "Simply stated, plea bargaining enables a defendant to reduce his penal exposure and avoid the stress of trial while assuring the State that the wrongdoer will be punished and that scarce and vital judicial and prosecutorial resources will be conserved through a speedy resolution of the controversy." *Ibid.* (quoting *Taylor, supra,* 80 *N.J.* at 361, 403 *A.*2d 889 (internal quotation marks omitted)).

This appeal presents a quintessential primer of all that is sensible and reasonable in plea bargaining: the State prosecuted, convicted and incarcerated a murderer, and the defendant—facing overwhelming proofs of guilt and with the advice of clearly competent and dedicated counsel—bargained for and received the benefit of a reduced charge and its similarly reduced sentence exposure. That is precisely how the system ought to work; it should not be derailed by the notion that judges simply know better than

defendants themselves what they can or cannot agree to in a plea bargain. Simply put, the majority's construct is ironic to the point of illogic; although a defendant is entitled to waive each and every constitutional, statutory or common law right he or she may have,[7] the majority now commands that a defendant cannot waive one and only one specific right: the right of allocution at sentencing. In other words, although a defendant may properly waive the right to counsel in its entirety, that same defendant cannot waive the right to have that counsel speak on the defendant's behalf at sentencing. That is sheer nonsense.

The better rule—and one which is completely consonant with our waiver jurisprudence on the whole—is to require that the court make inquiry as to whether the waiver of any right is voluntarily and intelligently made. If the court is so satisfied, then the waiver should be enforced, no matter which right is being waived.

Here, defendant was represented by counsel in what admittedly was a difficult case: the proofs stacked against defendant were

---

[7] By way of illustration, and certainly not as an exhaustive listing, a defendant may waive the constitutional right to remain silent, *see, e.g., State v. Knight,* 183 *N.J.* 449, 461–62, 874 *A.2d* 546 (2005) (explaining that even though "'the privilege against self-incrimination derives from the common law and is codified in our statutes and rules[,]'" (quoting *State v. Cook,* 179 *N.J.* 533, 549, 847 *A.2d* 530 (2004)), "[t]he key question here is whether defendant's waiver of the privilege [against self-incrimination] and resulting statements were made voluntarily, as due process requires"); or the constitutional right to trial by jury, *see State v. Dunne,* 124 *N.J.* 303, 316, 590 *A.2d* 1144 (1991) (explaining that, although "a defendant does not have a constitutional right to waive a jury trial and insist on a bench trial[,]" certain standards apply to defendant's request to waive trial by jury). Indeed, the majority bases its analysis on the constitutional right to competent counsel; yet, a defendant may properly waive the right to counsel in its entirety. *See Faretta v. California,* 422 *U.S.* 806, 818, 95 *S.Ct.* 2525, 2532, 45 *L.Ed.2d* 562, 572 (1975) (holding that Sixth Amendment, which applies to the states via Fourteenth Amendment, gives criminal defendants right to proceed without counsel when they voluntarily and intelligently elect to do so); *State v. DuBois,* 189 *N.J.* 454, 467, 916 *A.2d* 450 (2007) (explaining procedure for waiver of counsel under *State v. Crisafi,* 128 *N.J.* 499, 511–12, 608 *A.2d* 317 (1992)); *State v. Figueroa,* 186 *N.J.* 589, 593, 897 *A.2d* 1050 (2006) (same).

daunting. By bargaining his client's cooperation in "convey[ing] the truth as to the circumstances which led to her taking the life of her husband, and provid[ing] a truthful factual recitation of the manner in which she carried out the homicide[,]" defense counsel salvaged all that anyone could and made the best of what was a particularly bad set of circumstances: he successfully bargained for a downgrade of a certain first-degree murder conviction, which carried a *mandatory minimum* of thirty years' imprisonment, to a first-degree aggravated manslaughter conviction, which carried a *maximum* of thirty years' imprisonment, subject to a mandatory minimum of twenty-five and one-half years without parole. And, even if defendant was sentenced to the maximum for a first-degree aggravated manslaughter conviction—as, in fact, she was—that sentence still made her parole-eligible four and one-half years *before* she would have been eligible for parole on a first-degree murder conviction. In the circumstances presented, few lawyers would have been able to strike as generous a deal on behalf of their clients. Yet, under the majority's construct, that lawyer is now tagged as ineffective; that categorization is woefully undeserved.

Because there is no logical or reasonable basis to prohibit categorically the State and a defendant from bargaining away the right of allocution at sentencing in exchange for a separate plea agreement advantage, I cannot join in the majority's unreasonable condemnation of that practice. Therefore, in respect of that conclusion, I must respectfully dissent.[8]

---

[8] Because the plea agreement restrictions are proper and enforceable, one need not reach the question of whether counsel was ineffective in failing to present proofs of Battered Women's Syndrome in mitigation of defendant's sentence. *See generally State v. B.H.*, 183 *N.J.* 171, 182–83, 870 *A.*2d 273 (2005) (defining "battered wom[e]n['s] syndrome" as "a collection of common behavioral and psychological characteristics exhibited in women who repeatedly are physically and emotionally abused over a prolonged length of time by the dominant male figure in their lives" and explaining that "[t]he syndrome has become widely accepted as admissible evidence in self-defense cases because it has been determined to be useful in explaining conduct exhibited by battered

## III.

The majority also finds fault with the video depicting vignettes of the victim's life and internment; applying inapposite decisional authority relevant solely in capital cases—where a jury and not the judge determines whether a death sentence is to be imposed—the majority nevertheless concludes that the video should have been redacted to delete those portions that "have the great capacity to unduly arouse or inflame emotions." *Ante* at 159, 23 *A.*3d at 394. Although the majority so concludes, and save for endorsing the procedure that a "victim-impact video [be provided] in advance to both the trial court and defense counsel[,]" *ante* at 158, 23 *A.*3d at 393, it eschews providing any meaningful or substantive guidance to the sentencing courts on the length, content or presentation of any victim-impact video. *Ante* at 159, 23 *A.*3d at 394.

Let there be no doubt: even applying the majority's standard—that a victim-impact statement must be redacted to delete that which may "have the great capacity to unduly arouse or inflame emotions"—the victim-impact video offered and received here passes muster. That is because a victim-impact statement of whatever medium must satisfy general and tried-and-true standards for the admissibility of evidence, standards the victim-impact video here readily meets.

---

women toward their abusers" (citations omitted)). Even if counsel's failure to advance a Battered Women's Syndrome rationale in mitigation of sentence in fact was "outside the wide range of professionally competent assistance considered in light of all the circumstances of the case[,]" *Echols, supra*, 199 *N.J.* at 358, 972 *A.*2d 1091 (citation and internal quotation marks omitted), thereby satisfying the ineffectiveness prong of the *Strickland/Fritz* test, it plainly cannot be shown that such failure inured to defendant's prejudice, that is, that "there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[,]" *Echols, supra*, 199 *N.J.* at 358, 972 *A.*2d 1091 (citation and internal quotation marks omitted), thereby satisfying the prejudice prong of the *Strickland/Fritz* test. Therefore, no matter how one views the failure of counsel to advance a Battered Women's Syndrome claim in mitigation of sentence, this petition for post-conviction relief should be denied.

The proper point of departure is obvious: "[t]he admissibility of victim impact statements ... is of both constitutional and statutory dimension." *State v. Wakefield*, 190 *N.J.* 397, 482, 921 *A.*2d 954 (2007) (citing *N.J. Const.* art. I, ¶ 22 ("Victim's Rights Amendment"); *N.J.S.A.* 2C:11-3(c)(6) (victim impact statement statute); *N.J.S.A.* 52:4B–34 to –49 ("Crime Victim's Bill of Rights")), *cert. denied*, 552 *U.S.* 1146, 128 *S.Ct.* 1074, 169 *L.Ed.*2d 817 (2008). "Acknowledging, however, a potential for abuse, we have taken great care in defining the proper scope of admissible victim impact statements." *Ibid.* (citations omitted). *See also State v. Koskovich*, 168 *N.J.* 448, 497–99, 776 *A.*2d 144 (2001) (explaining application of Victim's Rights Amendment and victim impact statement statute); *State v. Muhammad*, 145 *N.J.* 23, 47–48, 54–55, 678 *A.*2d 164 (1996) (explaining requirements for admissibility of victim impact statements, and setting procedural limitations for their use). Although this appeal is couched in terms of what is or may be admissible in a sentencing hearing, sentencing courts—like all other courts—remain under the obligation to admit only relevant evidence, *N.J.R.E.* 402, that is, "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401; *see generally N.J.R.E.* 101(a)(2) (providing that New Jersey's "rules of evidence shall apply in all proceedings, civil or criminal, conducted by or under the supervision of a court").

That said, a sentencing court also must determine whether evidence, otherwise relevant, nonetheless is to "be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." *N.J.R.E.* 403. In gauging whether a trial court has struck a proper evidentiary balance, "[a] trial court's ruling on the admissibility of evidence is reviewed on appeal for abuse of discretion." *State v. Rose*, 206 *N.J.* 141, 157, 19 *A.*3d 985 (2011) (citing *Brenman v. Demello*, 191 *N.J.* 18, 31, 921 *A.*2d 1110 (2007)); *Estate of Hanges v. Metro. Prop. & Cas. Ins. Co.*, 202 *N.J.* 369, 374, 997 *A.*2d 954 (2010) ("[O]rdinarily, an evidentiary

determination made during trial is entitled to deference and is to be reversed only on a finding of an abuse of discretion[.]").

Those core evidentiary standards provide the guidance needed to determine the admissibility of victim-impact statements. As is the case in respect of any other item of evidence offered for admission, "[t]he trial court must balance ... competing concerns in the exercise of its discretion as the gatekeeper for the admission or exclusion of evidence." *State v. Rosales,* 202 *N.J.* 549, 562, 998 *A.*2d 459 (2010); *State v. Smith,* 158 *N.J.* 376, 391, 730 *A.*2d 311 (1999) (reiterating that "trial courts in a proper case must serve as gatekeepers"). Because the imposition of sentence is solely within the province of the trial court, that court rules *both* on the admissibility of victim-impact evidence *and* the weight that evidence will have, a task consistently defined as " 'among the most solemn and serious responsibilities of a trial court. No word formula will ever eliminate this requirement that justice be done.' " *State v. Blackmon,* 202 *N.J.* 283, 296, 997 *A.*2d 194 (2010) (quoting *State v. Roth,* 95 *N.J.* 334, 365, 471 *A.*2d 370 (1984)). For those reasons, the determination of whether a victim-impact statement of whatever nature or medium is admissible rests in the sound discretion of the sentencing court, not in some amorphous, inchoate standards.

It is worth emphasizing that the sentencing decision belongs to the sentencing court, as those decisions also are subject to limited appellate review. *State v. Cassady,* 198 *N.J.* 165, 180, 966 *A.*2d 473 (2009) ("Although appellate courts are expected to exercise a vigorous and close review for abuses of discretion by the trial courts, when reviewing a trial court's sentencing decision, an appellate court may not substitute its judgment for that of the trial court." (citations, internal quotation marks and editing marks omitted)). In sentencing, as in any other context, the proponent of evidence should insure that the evidence propounded is relevant, material and, hopefully and most importantly, persuasive; aesthetics or personal biases have no room in that calculus. Those comfortably familiar standards—relevance, materiality and per-

suasiveness—govern the admissibility and weight of victim-impact statements, regardless of what medium is used. And, as with any other evidence proffer, persuasiveness is not measured by its proponent, but by the fact-finder. The fact that the proponent of a victim-impact video ultimately seeks to persuade a sentencing judge engaged in one of "the most solemn and serious responsibilities of a trial court" serves as an initial objective censor of the video's contents, a result achieved without the need to superimpose personal views of propriety. The need to persuade an impartial magistrate is the goal; together with our *Evidence Rules,* it provides all of the guidance necessary, a threshold proponents ignore at their own peril.

The majority does not recognize these basic precepts, electing instead to usurp the gatekeeper function properly resident in the sentencing court. Because a fair application of the standard the majority adopts—one where redaction of a victim-impact statement of whatever medium is required only when necessary to delete that which may "have the great capacity to unduly arouse or inflame emotions"—should result in the conclusion that the victim-impact video shown here was properly admitted, and because the majority fails to explain how its overarching standard is to be applied if not as set forth here, I must dissent.

## IV.

Finally, the majority in the end determines that allowing Det. Simmons to read aloud in open court a victim-impact statement already submitted to and reviewed by the sentencing court is not error or, even if it is, the error was harmless. *Ante* at 159–60, 23 *A.*3d at 394. The majority nevertheless commands that "[o]n remand, the sentencing court should consider anew the propriety of Detective Simmons's making a statement in open court if he is offered the opportunity to do so." *Ante* at 160, 23 *A.*3d at 394.

As with the admission of the victim-impact video, the decision of whether a victim-impact statement may be read aloud—or, in evidentiary parlance, is "published"—in open court also is one

rightly entrusted to the sound discretion of the sentencing court. On a very elementary level, the thought that there may be something wrong with publishing in open court a piece of evidence already brought to the attention of and considered by the court is, to say the least, nonsensical. Yet, according to the majority, it is perfectly acceptable for someone tangentially related to a sentencing proceeding to send a written statement to the sentencing judge; it is perfectly proper for the sentencing judge to read that statement; it also is entirely acceptable for the sentencing judge to consider the contents of that statement in making a sentencing decision; but it is somehow out-of-bounds for the statement itself to be read aloud in open court. Reason cannot credit a rule so divorced from common sense.

Because, again, I would entrust the decision to accept and then publish a form of victim-impact statement to the sentencing court's broad discretion, I additionally dissent.

## V.

For the foregoing reasons, I respectfully dissent from the majority's judgment that voids "the plea agreement's restrictions on defense counsel's right to argue for a lesser sentence[,]" *ante* at 160, 23 *A.*3d at 394. Further, to the extent the majority's opinion can be read to limit unnecessarily a sentencing court's necessarily broad discretion in admitting a victim-impact video or the publishing of a victim-impact statement, I also dissent.

*For reversal and remandment*—Justices LONG, LaVECCHIA, ALBIN and HOENS—4.

*For affirmance*—Chief Justice RABNER and Justice RIVERA-SOTO—2.