**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1485-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

PHILIP SEIDLE,
a/ka/ PHILIP T. SEIDLE,

     Defendant-Appellant.

_____

> Argued March 8, 2021 – Decided July 22, 2021
>
> Before Judges Suter and Smith.
>
> On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 15-11-1963.
>
> Robin Kay Lord argued the cause for appellant.
>
> Maura K. Tully, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Maura K. Tully, of counsel and on the brief).

PER CURIAM

Defendant Philip Seidle pleaded guilty to first-degree aggravated manslaughter and second-degree endangering the welfare of a child. Defendant appeals an October 29, 2019 order which denied defendant's petition for post-conviction relief (PCR) and his request for an evidentiary hearing. Defendant argues that he received ineffective assistance of counsel because his defense counsel did not enlist a qualified mental health expert. Alternatively, defendant argues that he has at least presented a prima facie case of ineffective assistance of counsel, entitling him to an evidentiary hearing. We affirm for the reasons set forth below.

I.

Defendant and Tamara Seidle divorced during May 2015. On the morning of June 16, defendant drove past the home where he and Ms. Seidle lived before their separation. He saw a car in the driveway he did not recognize and recorded the license plate number in his phone. Defendant called and asked Ms. Seidle who owned the car. She told him it was none of his business and hung up. After online research, defendant discovered that Ms. Seidle's boyfriend was from Georgia, matching the license plate for the car. Defendant concluded that the car belonged to the boyfriend.

A-1485-19

That same day, defendant planned to take his seven-year-old daughter dress shopping for a father-daughter dance. As he and his young daughter left to go shopping, defendant brought his gun belt with his service weapon.

While in the car with his daughter, defendant called Ms. Seidle again. Defendant asked her about the car in the driveway; she responded once again it was none of his business. Defendant told Ms. Seidle that if the boyfriend was living there, he did not approve. Defendant then asked his daughter about the boyfriend; she told him the man has been living there for about two weeks. Defendant believed Ms. Seidle was attempting to replace him, as a father, with her boyfriend.

After talking with his young daughter, defendant drove to Ms. Seidle's place of employment, a church in Asbury Park. When he arrived, she was in her car and fled the parking lot at a high rate of speed; defendant pursued. Defendant rammed Ms. Seidle's car with his car and they came to a stop. Defendant exited his car holding his service weapon and fired a total of twelve shots, in two separate volleys, into Ms. Seidle's car, killing her.

After the second volley, defendant held his gun to his head. He told responding officers he would surrender if he was able to see his children. The

3

officers successfully negotiated with defendant and removed his young daughter and Ms. Seidle from their respective cars.

During the incident, defendant texted his children, "[y]our mother is dead because of her actions and yours, good-bye forever." Defendant also texted his friend, "I got tired of Tamara's shit and shot her . . . [s]he fucked with me too many times." Defendant asked for his children to be brought to the prosecutor's office in Asbury Park. After the police brought them to the office, he surrendered.

Defendant was charged with three counts: (1) first-degree murder, N.J.S.A. 2C:11-3(a)(1); (2) second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and (3) second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a). On March 10, 2016, defendant pleaded guilty to counts one and three. Count one was amended to aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1). Count two was dismissed. The State agreed to recommend a thirty-year term of incarceration with an eighty-five percent parole ineligibility term on count one and a ten-year term of incarceration on count three, running concurrently.

During the plea colloquy, the court asked defendant whether he was "suffering from any physical or mental condition that might affect his ability to

understand what is going on in court [that day] or to make a knowing and voluntary decision." Defendant replied "no." The court asked him whether he was able to read and understand everything in the agreement, and if he went over the agreement with his attorney. Defendant replied "yes." The court asked defendant whether his attorney "answered all of [his] questions" and whether he was "satisfied with his representation." Defendant replied "yes." The court asked if defendant needed further time to speak with his attorney, he responded "[n]o, I don't."

Defendant recounted the events which lead to the charges against him, and his attorney asked him questions concerning the charges. The following exchange between defendant and counsel took place:

> Q. Mr. Seidle, first, you and I have discussed what the proofs would have to be to find you guilty of aggravated manslaughter and I've explained that aspect of the law to you; am I correct?
>
> A. Yes.
>
> Q. And you've been in law enforcement over 20 years and are familiar generally, although you're not a lawyer, with the laws in the State of New Jersey for criminal offenses?
>
> A. Yes, I am.
>
> Q. So I explained to you that what aggravated manslaughter means under the statute is that the actor,

5

in this case you, recklessly caused the death [of] the victim under circumstances manifesting extreme indifference to the value of human life. And I've explained what all that means to you, correct?

A.    Yes, you have.

Q.    Essentially what that means is that you consciously disregarded known and unjustifiable risks that there was a probability the victim would die when you shot at or in her direction; am I correct?

A.    Yes.

Q.    So with respect to Count 1 as amended to aggravated manslaughter, you knew that at the time that you were shooting at or in the direction of the victim, especially considering your law enforcement background and your firearms training, that by firing what has been calculated to be 12 shots into the vehicle of the victim you recklessly under circumstances manifesting extreme indifference to the value of human life created a probability that the victim would be killed?

A.    Yes.

Q.    And by doing that you consciously disregarded known and unjustifiable risks that that probability would occur that she would die, correct?

A.    Yes.

Q.    And, in fact, as a result of shooting at or in her direction she was, in fact, struck and killed by bullets from a handgun that you discharged?

A.    Yes.

6

Q. And so how do you plead as to Count 1 amended to be aggravated manslaughter, guilty or not guilty?

A. Guilty.

. . . .

Q. Now, also, in reviewing the discovery in this case and considering whether you should take a plea versus going to trial, we had discussed certain potential defenses that may or may not have been available to you such as the defenses of diminished capacity or some form of mental disease or defect; am I correct?

A. Yes, that's correct.

Q. As well as a potential defense of passion/provocation, which could potentially reduce murder down to manslaughter, I've discussed that with you as well –

A. Yes.

Q. -- is that right?
And you understand by taking this plea today that you are giving up the right to assert those defenses before a jury for a jury to decide whether they apply and whether they would completely excuse your conduct with respect to the diminished capacity, mental disease or defect defense, or reduce the charge down to manslaughter from murder with respect to Count 1. You understand you're giving that up?

A. Yes.

Q. You also understand that you are nevertheless reserving the right to argue to the Court at sentencing, as we will, that certain mitigating factors apply in this

A-1485-19

case for the Court to consider sentencing at the lower end of the range with regard to both Count 1 and Count 3. We've talked about that as well?

A.    Yes.

Q.    And specifically, I've indicated to you with regard to [m]itigating [f]actor No. 4, which indicates there [were] substantial grounds tending to excuse or justify defendant's conduct though failing to establish a complete defense, that we will make an argument to the Court that that mitigating factor applies but it's going to be up to the [j]udge ultimately to decide whether it applies. Do you understand that?

A.    Yes.

Q.    And if it applies, it's up to the [j]udge to determine how much weight or what quality he's going to give to that particular mitigating factor in determining your sentence?

A.    Yes.

Q.    And you also understand that the State is going to argue against the mitigating factors and they're going to argue in favor of certain aggravating factors that they seek, which we'll challenge, which the Court has to make decisions on as well. You understand that?

A.    I thought it said here that they were dismissing the aggravating factors.

Q.    Yeah, those -- the aggravating factors as to the murder charge, but just as to a general sentence, to achieve a sentence at the top end of the range, there's other aggravating factors --

8

A. Okay.

Q. -- that they're going to argue about.

A. Okay.

Q. Do you understand that?

A. Yes.

Q. Those are different than the ones they're dismissing?

A. All right.

Q. So you're giving up the entitlement to ask for a complete defense but reserving the right to argue certain mitigating factors is the bottom line of this. And you understand that?

A. Yes.

Q. And you're making that decision freely, knowingly, and intelligently?

A. Yes.

Q. After consultation with me; is that correct?

A. Yes.

Q. Do you have any other questions of me with regard to that particular issue?

A. No.

9

## II.

### A. The Sentencing Hearing

The sentencing court found defendant was fifty-years of age at the time of the sentencing, he had no prior criminal history, and that this was his first interaction with the criminal justice system. Further, defendant was a sergeant with the Neptune Township Police Department at the time of the killing, and he had been employed there since July 1, 1993. The court found defendant had no substance abuse or alcohol problems. Defendant had a history of both marital and mental health counseling.

The court applied aggravating factor one.[1] The court noted the tragic circumstances of the victim's death. Defendant chased the victim through Asbury Park at high speeds, while his daughter was in the passenger seat of his car. After defendant rammed the victim's car with his, he emerged and fired two "volley[s] of shots," one volley in the side window, then minutes later, he fired a second volley through the front of the car.

The court applied aggravating factor two.[2] The court found Ms. Seidle "was caused to suffer very serious physical and psychological injuries prior to

---

[1] See N.J.S.A. 2C:44-1(a)(1).

[2] See N.J.S.A. 2C:44-1(a)(2).

her death." In addition, the court found that "chasing, ramming, and trapping [the victim] made her particularly vulnerable or incapable of resistance." The court also noted the young age of defendant's daughter, who was seven years old at the time of the shooting.

The court applied aggravating factor three.[3] The court applied the factor because defendant "has shown himself, through the commission of these offenses, to be a person capable of incredibly serious acts of violence." However, the court only placed moderate weight on this factor because defendant was a law-abiding citizen prior to the shooting, and "this level of violence appears to be an aberration."

The court applied aggravating factor nine.[4] The court gave the factor moderate weight. The court explained the need for general deterrence, "to deter any individual who might cause the death of another person."

The court found mitigating factor four did not apply.[5] The court acknowledged it received submissions and arguments on the record indicating defendant was very distraught and upset over visitation. The court found these

---

[3] See N.J.S.A. 2C:44-1(a)(3).

[4] See N.J.S.A. 2C:44-1(a)(9).

[5] See N.J.S.A. 2C:44-1(b)(4).

arguments did not rise to substantial grounds tending to excuse or justify defendant's conduct and concluded there was insufficient evidence to support a finding of mitigating factor four.

The court applied mitigating factor seven.[6]  The court applied the factor because defendant had no criminal history until this matter; defendant had been employed as a police officer since 1993; and defendant had received an honorable discharge from the Navy.  The court gave this factor moderate weight.

The court found the aggravating factors substantially outweighed the mitigating factors.  The court imposed the sentence we stated earlier.

## B.  The Post-Conviction Relief Hearing

On April 3, 2019, defendant filed a petition for PCR.  Defendant's position in his PCR motion was essentially the same as it is before us: "plea counsel was ineffective in that he failed to have defendant evaluated by a forensic psychologist regarding his state of mind at the time of the incident."

PCR counsel retained Dr. Gerald Cooke, who conducted a psychological evaluation of defendant and wrote a report.  Dr. Cooke stated that defendant experienced a dissociative trance, which he described as a "condition characterized by constriction of consciousness, depersonalization, derealization,

---

[6]  See N.J.S.A. 2C:44-1(b)(7).

perceptual disturbances, micro-amnesias, transient stupor or alterations in sensory-motor functioning." Dr. Cooke concluded that defendant was not "acting in a deliberate and intentional manner," because he was "experiencing gross impairment in cognitive functioning" and was "overwhelmed by [his] emotions." Consequently, Dr. Cooke opined defendant lacked capacity to form specific intent.

Dr. Cooke also concluded defendant did not meet the diagnostic criteria for any personality disorder or mental illness. His opinion was defendant developed "Adjustment Disorder with Mixed Depressed Mood and Anxiety around 2012" which "increased in severity to the point that by June 2015 he was suffering from a major depressive disorder." Dr. Cooke stated that either the dissociative trance or the major depressive disorder constituted diminished capacity, and the two conditions combined would lead to a more substantial and severe diminished capacity.

On October 29, 2019, the court heard argument on defendant's petition. Defendant argued that had defense counsel obtained a psychological evaluation, or reviewed all the records, he could have proceeded to trial and presented a diminished capacity defense. The PCR court was not persuaded that defense

13

counsel was ineffective for failing to obtain an expert evaluation of petitioner's mental state.

The court found defendant knowingly accepted the plea agreement. The court noted that on several occasions during the plea colloquy, defendant "acknowledged he knew that by shooting at or in the direction of the victim, especially considering his law enforcement background and firearms training, he recklessly and consciously disregarded known and unjustifiable risks" that the victim would die. The court found defendant admitted he considered accepting the plea versus going to trial. Additionally, defendant knowingly waived his right to assert any defense before a jury after discussing the diminished capacity defense and other mental disease defenses with counsel. The court concluded that "[i]t cannot now be said he was under some dissociative trance . . . at the time of the incident based on one psychological evaluation performed after both the plea and sentencing in support of the PCR." Citing Strickland v. Washington, 466 U.S. 668, 689 (1984), the court expressly found "whether or not to offer expert testimony is a strategic choice made by trial counsel and such decisions are virtually unchallengeable . . . ."

Defendant alternatively argued "that a psychological evaluation would have provided him with more mitigating evidence in support of a lesser

A-1485-19

sentence." The PCR court noted defendant was making "essentially the same argument as the defendant in State v. Hess, but the cases are distinguishable . . . ."[7] The court found that unlike Hess, defense counsel utilized the mitigating information in his possession. Thus, the question before the PCR court was "did [defendant's counsel] have all of the information and would it have made a difference." The PCR court noted defense counsel offered evidence regarding mitigating factor four from defendant's self-selected psychological exam records, and these records did not present substantial grounds for excusing defendant's conduct. The court noted defense counsel did present evidence of diminished capacity "before and at the time of the shooting" and defense counsel raised diminished capacity on direct appeal, which was denied.[8]

Furthermore, the PCR court found Dr. Cooke's report insufficient to demonstrate prejudice because the report did not show a reasonable probability that a jury would reduce the crime to manslaughter, or that the court would lessen the sentence. "In fact, the report merely relays his opinion that defendant, quote, lacked the capacity to perform – to form specific intents which addresses the mens rea for murder rather than manslaughter." The PCR court specifically

_____

[7] State v. Hess, 207 N.J. 123 (2011).

[8] State v. Seidle, No. A-1028-16 (App. Div. Feb. 07, 2017).

found "[d]efense counsel's recommendation to accept the plea which limited his sentencing risk to only [thirty] years as opposed to life in prison cannot in any way be deemed deficient." Thus, the court found defendant did not make a prima facie case for ineffective assistance of counsel, and therefore denied defendant's request for an evidentiary hearing.

On appeal, defendant argues the following:

> POINT I. THE LOWER COURT ERRED IN DENYING DEFENDANT'S PETITION FOR POST-CONVICTION RELIEF AS DEFENDANT ESTABLISHED THAT HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AND DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS DIMINSIHED CAPACITY DEFENSE AT THE TIME HE ENTERED INTO HIS PLEA AGREEMENT.
>
> POINT II. ALTERNATIVELY, THE DEFENDANT HAS, AT THE VERY LEAST, PRESENTED A PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF COUNSEL, ENTITLING HIM TO A REMAND FOR AN EVIDENTIARY HEARING ON HIS PETITION FOR POST-CONVICTION RELIEF.

III.

"Our standard of review is necessarily deferential to a PCR court's factual findings based on its review of live witness testimony." State v. Nash, 212 N.J. 518, 540 (2013). "[W]e will uphold the PCR court's findings that are supported by sufficient credible evidence in the record." Ibid. (citing State v. Harris, 181

16

N.J. 391, 415 (2004)). However, "[w]here, as here, the PCR court has not conducted an evidentiary hearing, we review its legal and factual determinations de novo." State v. Aburoumi, 464 N.J. Super. 326, 338–39 (App. Div. 2020) (citing State v. Jackson, 454 N.J. Super. 284, 291 (App. Div. 2018)).

There is a two-prong test for ineffective assistance of counsel claims arising from guilty pleas. First, defendant must show "counsel's assistance was not 'within the range of competence demanded of attorneys in criminal cases . . . .'" State v. DiFrisco, 137 N.J. 434, 457 (1994) (quoting Tollett v. Henderson, 411 U.S. 258, 266 (1973)). Second, defendant must show "that there is a reasonable probability that, but for counsel's errors, [he or she] would not have pled guilty and would have insisted on going to trial." State v. Gaitan, 209 N.J. 339, 351 (2012) (alteration in original) (quoting State v. Nunez-Valdez, 200 N.J. 129, 139 (2009)).

When assessing an attorney's performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at the time." DiFrisco, 137 N.J. at 457 (quoting Strickland, 466 U.S. at 689). A reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,"

17

which means the defendant must overcome the presumption that "the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Strickland, 466 U.S. at 689).

Defendant argues that based on his mental health history and his past psychological and emotional issues, his counsel should have retained a qualified mental health expert. Defendant asserts the expert would have "investigate[d] whether [defendant] had a state of mind defense." Therefore, defendant argues he was denied effective assistance of counsel and his decision to plead guilty was not informed. We disagree.

During the plea hearing, defendant testified that counsel answered his questions and that he was satisfied with his legal representation. Defense counsel asked defendant whether he recalled being told what the State needed to prove in order to find him guilty of aggravated manslaughter. Counsel also asked defendant whether he recalled what aggravated manslaughter was under the statute and what he was being charged with. Defendant responded in the affirmative to both questions. Next, counsel asked the following question:

> [Y]ou knew that at the time that you were shooting at or in the direction of the victim, especially considering your law enforcement background and your firearms training, that by firing what has been calculated to be 12 shots into the vehicle of the victim you recklessly under circumstances manifesting extreme indifference

18

to the value of human life created a probability that the victim would be killed?

Defendant answered yes. Counsel then asked defendant about going to trial versus taking the plea deal, as well as about their discussion on defenses. Defendant agreed he had waived his opportunity for a jury trial by agreeing to plead guilty. As to potential defenses, counsel asked defendant about diminished capacity, mental disease or defect, and passion or provocation. Defendant agreed that they discussed those potential defenses. Further, defendant agreed that he and counsel discussed arguing for mitigating factor four during sentencing.

Defense counsel argued at length for mitigating factor four during sentencing. Counsel asked the court to find defendant acted with a reckless mental state rather than a purposeful knowing mental state. He noted defendant's employer required him to submit to an independent psychological exam as part of a return-to-work evaluation. Counsel argued the exam records showed defendant was suffering from emotional and financial strain due to the divorce. Defendant felt that Ms. Seidle was interfering with his relationship with his children. Defense counsel noted the exam records showed defendant was emotional and tearful when talking about his relationship with his children.

19

Counsel argued these records showed defendant had a "psychological and emotional problem…not fully addressed" before the shooting.

We find the record shows defense counsel was well within the range of competence demanded of attorneys in criminal cases. DiFrisco, 137 N.J. at 457 (quoting Tollett, 411 U.S. at 266).

We view counsel's strategic decisions under the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Ibid. (Strickland, 466 U.S. at 689). The record shows defendant and his attorney discussed different legal strategies. They discussed what the State was required to prove to in order to convict defendant of murder and aggravated manslaughter if they went to trial. Further, the record shows they discussed diminished capacity and provocation defenses. Defendant and his counsel specifically discussed that defendant understood he was giving up these defenses and the chance for a jury to hear them. Defense counsel used defendant's return-to-work medical records to argue mitigating factor four. Our review of the record leads us to conclude defendant failed to overcome the strong presumption that his counsel's actions were sound trial strategy.

Defendant also failed to overcome the presumption against a finding of ineffective assistance where defense counsel informed defendant of the pros and

cons of going to trial rather than taking the plea. Additionally, defense counsel argued that the mens rea for murder did not fit defendant's crime; rather the mens rea for aggravated manslaughter fit defendant's diminished capacity before and at the time of the incident. Looking at counsel's conduct from his perspective and "eliminat[ing] the distorting effects of hindsight" the strategic decision not to have defendant evaluated and to plead guilty to aggravated manslaughter "might be considered sound trial strategy . . . ." Ibid. (quoting Strickland, 466 U.S. at 689). Had counsel not done so, defendant would have been exposed to the risk of a murder conviction at trial.

Defendant next argues his case is similar to Hess. He argues counsel did not exercise reasonable efforts to ascertain whether defendant had a diminished capacity. He further argued that had trial counsel retained an expert he would have learned defendant did not possess the required mental state for murder.

The case before us is distinguishable from Hess. In Hess, the Court held the defendant was denied her constitutional right to the effective assistance of counsel. Hess, 207 N.J. at 160. The "defendant pled guilty to aggravated manslaughter for killing her husband . . . ." Id. at 129. The defendant's attorney agreed to refrain from seeking a lesser sentence under the agreement. Id. at 137. Consequently, the defendant believed she could not mention any evidence of her

21

abuse at the hands of the victim or attempt to argue for mitigating factors at sentencing. Id. at 138.

At sentencing, the defendant's attorney possessed nine witness statements that corroborated "his client's account of physical and mental abuse . . . ." Id. at 148. The defendant's expert generated a report stating that defendant's relationship with victim "is consistent with a pattern of moderate-to-severe intimate partner abuse, including physical and psychological abuse" and consistent with Battered Women's Syndrome. Ibid. The Hess Court stated that Battered Women's Syndrome warranted an argument for mitigating factor four. Id. at 149. The Court also noted that defense counsel failed to present evidence to support mitigating factors three, five, eight, or nine. The Court concluded that this "failure to bring relevant information in his file to the attention of the trial court so that the court could independently identify and weigh mitigating factors cannot be ascribed to strategy or reasonable professional judgment . . . ." Id. at 149.

Like the defendant in Hess, defendant pleaded guilty to aggravated manslaughter, however the similarity ends there. Defense counsel in Hess possessed evidence to support mitigating factors but failed to argue them based on a restrictive agreement. As we noted earlier, this record reveals defense

22

counsel's strenuous efforts to argue mitigating factors at sentencing. We are satisfied that defendant and his counsel believed pleading guilty to aggravated manslaughter was less risky than going to trial on a murder charge. We find defendant's decision to accept the plea agreement and argue for a lower sentence constituted appropriate strategy.

Further, unlike in Hess, defense counsel here was able to argue for mitigating factor four based on defendant's history of emotional and mental problems stemming from his divorce. Defense counsel presented evidence of defendant's mental state before the killing from a return-to-work evaluation done at the request of the Neptune Police Department. Thus, unlike Hess, defendant had effective assistance of counsel at sentencing. We conclude defendant received effective assistance of counsel and knowingly waived his diminished capacity defense.

## IV.

Defendant argues in the alternative that he made a prima facie case for ineffective assistance of counsel, entitling him to an evidentiary hearing.

"Rule 3:22-10 does not require evidentiary hearings to be held on post-conviction relief petitions," but rather it "recognizes judicial discretion to conduct such hearings." State v. Preciose, 129 N.J. 451, 462 (citing State v.

<u>Odom</u>, 113 N.J. Super. 186, 273 (App. Div. 1971)).  "Thus, trial courts ordinarily should grant evidentiary hearings to resolve ineffective-assistance-of-counsel claims if a defendant has presented a prima facie claim in support of post-conviction relief."  <u>Id.</u> at 462–63; <u>see also</u> <u>State v. Jones</u>, 219 N.J. 298, 311 (2014).  To establish a prima facie claim of ineffective assistance of counsel, a defendant must demonstrate the reasonable likelihood of succeeding under the test set forth in <u>Strickland</u>, 466 U.S. at 694.  <u>Preciose</u>, 129 N.J. at 463.

For the reasons amply set forth above, we find no merit to this argument.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION